## PEOPLE v TAYLOR

1. CRIMINAL LAW—WITNESSES—BIAS—HARMLESS ERROR.

   The prosecution's failure to present to the jury evidence of the bias of two of its witnesses was not reversible error where, even without their testimony, there was sufficient evidence to justify a verdict of guilty, and where the Court of Appeals is convinced the error was harmless without a reasonable doubt.

2. CRIMINAL LAW—WITNESSES—ACCOMPLICES—MITIGATION OF PUNISHMENT.

   The fact that an accomplice-witness hopes or expects that he will secure a mitigation of his own punishment by testifying on behalf of the prosecution does not disqualify him.

3. CRIMINAL LAW—EVIDENCE—ERRONEOUS ADMISSION—HARMLESS ERROR.

   The erroneous admission of a police officer's statement made during cross-examination relating to a defendant's right to remain silent, not objected to, the prejudicial effect of which could have been eliminated by a curative instruction, was harmless error where from the entire record it does not appear to have contributed to the defendant's conviction.

4. CRIMINAL LAW—WITNESSES—INTIMIDATION—CREDIBILITY.

   The admission of testimony of a witness who was allegedly intimidated created no miscarriage of justice where such testimony was corroborative of that of another witness and merely cumulative, and defense counsel was aware of the alleged intimidation at the time of trial but made no demand for an investigation, mistrial, or special instruction to the jury; in essence the fact that the witness may have been intimidated

REFERENCES FOR POINTS IN HEADNOTES

[1] 30 Am Jur 2d, Evidence §§ 1080, 1084.

[2] 21 Am Jur 2d, Criminal Law, § 578.

[3] 21 Am Jur 2d, Criminal Law, § 349 *et seq.*

[4] 58 Am Jur, Witnesses, § 860 *et seq.*

[5] 53 Am Jur 2d, Trial § 14 *et seq.;* § 536.

into giving false testimony was a matter relating to his credibility as a witness.

5. CRIMINAL LAW—TRIAL—ADJOURNMENTS—INSTRUCTIONS TO JURY.

Failure of the trial judge in announcing a two-day adjournment of a trial for murder to instruct the jurors with respect to discussing the case or reading or hearing anything about it outside the courtroom was not reversible error where no evidence was offered that the jurors did in fact discuss the case among themselves or with others or that they read anything about it, and dissatisfaction with the adjournment procedures was never indicated until filing the appeal.

Appeal from Washtenaw, William F. Ager, J. Submitted Division 2 January 8, 1973, at Lansing. (Docket No. 12076.) Decided April 23, 1973.

Kent Taylor was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *Arthur E. Lux,* Assistant Prosecuting Attorney, for the people.

*Arthur J. Tarnow,* State Appellate Defender, for defendant.

Before: BRONSON, P. J., and McGREGOR and DANHOF, JJ.

McGREGOR, J. A jury convicted the defendant of first degree murder, MCLA 750.316; MSA 28.548, and from the mandatory life sentence duly imposed, defendant brings this delayed appeal by leave of this Court.

The evidence shows that, on the late afternoon of September 26, 1969, defendant and Robert Ward followed an automobile driven by Fred Otto to the vicinity of 819 Jefferson Street, in Ypsilanti, Mich-

igan; they were accompanied by a passenger. The defendant and Ward left their automobile at the corner, walked to the vicinity of 819 Jefferson, and attempted to rob the driver of the other automobile; the driver, Otto, bolted from his car, ran south, and the defendant fatally shot him in the back. The defendant and Ward then ran to a pool hall, followed by Ward's auto, then driven by the former passenger.

Carlton Thomas, who lives at 819 Jefferson, testified that the victim came to his house at approximately 6 p.m. on September 26, 1969, to collect some insurance. Another witness, Aubrey Lee, testified that, on the evening in question, he was standing on Jefferson Street with a friend; that two men came from behind the hedges near a vacant house on the corner, crossed the street, and headed toward the victim's car; that the victim forced his way out of the car and began running towards this witness and his friend. The two unidentified men turned at the same time, the tall one paused, and there was a crack as if a firecracker had exploded. The victim put his hands on his back and screamed, "They got me, they got me". This witness further testified that the insurance man, the victim, was Caucasian, while his assailants were both Negroes, one short and one tall; that there was a streetlight on the corner past which the two men ran as they made their escape; that the shorter man wore a white jacket; that both men had Afro hairstyles; and that, before the victim forced his way from the car, both men had been pushing against the door. This car-pushing testimony was crucial, since it led the police to process the decedent's car for fingerprints.

A fingerprint technician of the Michigan State Police testified that two latent prints, taken from the victim's car, matched defendant's known fin-

gerprints, and the witness concluded that the marks on the car were made by the defendant's hand.

Another witness testified that he saw a man who stumbled as he ran south across Jefferson Street; that he saw two other men beside a car parked on the north side of the street; that as the first man ran across the street, he was shot by the taller but lighter-weight of the two men; and that as he fell to the ground, the first man hollered, "I'm shot, they got me, they got me, I'm shot". The two assailants ran past the streetlight on the corner and the witness was able to ascertain that the pursuers were black.

A third witness named Franklin Wells testified that he was standing on the steps of a poolroom on Monroe Street, near Hamilton, on the night of the victim's death; that he saw a white man walk to a car parked on Hamilton; that two black men walked to the car but the white man drove away; the witness identified the two men as this defendant and Robert Ward. Wells then asked Ward for a ride to Ann Arbor; Ward agreed, and Wells sat in the back seat of the car, a green Lincoln Continental. This defendant sat in the front seat, while Ward drove. The three drove down Monroe to Jefferson, turned right on Brooks, and stopped near the corner. Someone said, "Look", and Wells turned and saw a parked car similar to the one he had seen on Hamilton near the poolroom. Ward and the defendant left the car and told Wells they would be back in a few minutes. The last he saw of them, they were headed towards the back of the car; five minutes later, Wells saw the pair returning from that direction. Ward told him to drive the car to the poolroom and Wells did so. Wells later saw Ward and the defendant and returned the car

keys to Ward. Wells further testified that at this later meeting, the defendant had altered his clothing somewhat, changing from a jacket to a suit coat, or something similar.

Some time later, Wells visited the Ypsilanti police station at the request of Robert Ford, who was in jail pending disposition of a marijuana charge against him; while there, the police asked to talk to Wells concerning the death of Fred Otto, the victim in the instant case. A police sergeant told this witness that if he refused to make a taped statement he would be arrested.

Robert Ford corroborated the testimony of Franklin Wells. Ford testified that upon the return of Ward and the defendant to the poolroom on Ramsey Street, Ford asked the defendant for money he was owed; the defendant replied that he had no money, and the witness described the subsequent conversation:

"*Q.* And, what else was said at that time?
"*A.* I said that I heard, you know, they had some money,
"*Q.* Well, state exactly the words you used as best you can recall.
"*A.* I said I heard that they had robbed an insurance man or something like that.
"*Q.* And what did Kent Taylor state, exactly, as best you can recall his words, when you made that statement to him?
"*A.* He said that, you know, he didn't get no money, and said the insurance man kicked him in the but *[sic]* or something."

The witness further testified that about a half hour later, he talked to the defendant inside the poolroom, and when he stated that he had heard that an insurance man had been killed, the defendant told him, "He said he had shot the guy

but he didn't mean to do it". This witness stated that he expected no favors for testifying at this trial. Before calling Wells to the police station, Ford made a statement on tape for the police.

Apparently, Ford received no favors for coming forward with his testimony; however, the sentencing on the marijuana charge which had originally been scheduled to take place before the trial of this defendant was postponed until after the trial.

Ward had also been charged with the murder of the insurance man, Fred David Otto, which charge was pending against him at the time he testified. Ward testified that, on the day of the Otto homicide, he was in the Ramsey Street poolroom with the defendant, discussing ways of getting money; that they saw the insurance man and the defendant suggested that they ought to take his money; that the pair ran towards the insurance man's car but he got in and drove away; that the defendant suggested they follow the car, so they got into Ward's car and pursued the insurance man, accompanied now by Franklin Wells; that they saw the insurance man again on Jefferson near Brooks. Ward further testified that the two approached the insurance man's car from two sides, defendant on the driver's side, Ward on the other side, as the insurance man returned to his auto; that there had been no conversation concerning weapons, but as the victim got into his car, the defendant produced a gun, a small automatic pistol. The victim screamed, forced his way out of the car, and started to run, at which point the defendant shot him. Ward and the defendant then ran away. Ward stated that his own trial date had been set for March 25, 1970 (trial of the instant matter was had on March 16, 18, 23, and 24, 1970), that no promises had been made in return for his testi-

mony, but that he felt he had to testify in order to clear himself, that is, to save himself from a life sentence.

The record further shows that, one month later, Ward appeared before a circuit judge, at which time an assistant prosecutor moved that Count I (first-degree murder) of the information be dismissed, and that Count II (second-degree murder) be added. Ward pled guilty to the amended information and, on June 24, 1970, Ward was sentenced to 5-1/2 to 15 years in prison, with a recommendation that he not be sent to the same institution as defendant Kent Taylor.

At the time of Ward's plea, the assistant prosecutor stated that there had been conversations between the attorney for Ward, the prosecuting attorney, and Ward, a few days before the trial of this defendant, concerning whether or not Ward would testify.

At trial, this defendant presented no evidence, but chose to rely on his presumption of innocence and the failure of the prosecutor to prove him guilty of the crime charged beyond a reasonable doubt.

About one year later, on March 5, 1971, Ward signed an affidavit which was appended to this defendant's brief on appeal, in which he stated that his testimony at defendant's trial was a deliberate lie, given in exchange for the prosecutor's promise to get him out of the murder charge. Parenthetically, it should be noted that the record does not indicate that this affidavit has ever been filed in the trial court or in any other court, and is, therefore, not a part of the official record for our consideration.

Defendant contends that error occurred because the jury did not hear certain testimony or facts

which might have borne upon the credibility of the prosecution witnesses.

It is defendant's contention that Ward testified that the last time he had spoken with the police was one month before defendant Taylor's trial. Yet it appears from the transcript of Ward's sentencing that there had been discussions between the prosecuting attorney and Ward and his attorney only a few days before this defendant's trial concerning whether or not Ward would testify against this defendant; that this was relevant in assessing the bias of the witness, as it related to his credibility, but that the jury was not apprised of these facts. However, the record contains no evidence that the prosecutor had, in fact, made a firm deal with Robert Ward.

The defendant's reliance upon *People v Virgil Lee Evans,* 30 Mich App 361 (1971), is not well placed. In *Evans,* his codefendant took the stand in his own behalf and testified that he and Evans had held up the grocery store in question, and that Evans had fired the fatal shot. The codefendant denied that he expected any benefits as a result of his testimony.

"Evans then took the stand for the purpose of rebuttal and testified that Tanner had told him that officer Smith promised a reduction of the charge against him to manslaughter if Tanner would confess and implicate Evans.

"Tanner returned to the stand to deny that he had told Evans of any promise of leniency in exchange for his testimony or that he knew an officer Smith. On cross-examination Tanner denied that anyone promised that he would be permitted to plead guilty to manslaughter in exchange for his testimony.

"Officer Smith then testified that he had had no conversation with Tanner about the case.

"All sides rested and *immediately thereafter, without*

*a recess,* the jury was excused and Tanner offered a plea of guilty to manslaughter." *People v Evans, supra,* 364–365.

The *Evans* court refused to advise the jury that Tanner (the codefendant) had pled guilty to manslaughter, although a written request was made by Evans' attorney that this information be given to the jury.

"Upon defendant's motion to bring before the jury the fact of his codefendant's plea of guilty to a lesser offense after the defense rested its case, where the issue of promise was raised during trial, the court should have allowed the attorney to argue the *record* of the plea made in this case or in the alternative to *sua sponte* reopen the case to allow the defendant to offer proof on this point.

"*People v Sawicki* (1966), 4 Mich App 467, cited by the trial court, is distinguishable because in that case the defense counsel was not restricted from bringing out that the alleged accomplice had pled guilty some seven months previously and had not yet been sentenced at the time of trial. The court held that a trial judge is not required to comment in his instructions concerning a witness's interest since it bears upon the question of credibility which is reserved to the jury. That is not the issue in the case presently before us." *Evans, supra,* 369–370.

Under cross-examination by the defendant's attorney regarding bias and credibility, Ward testified:

"*Q.* Mr. Ward, in reference to your testimony about what you say you recall occurring that evening, in discussing this with the prosecuting attorney and your attorney a month ago, were any promises made to you if you made or gave testimony about this—in this matter?

"*A.* No.

"*Q.* Are you certain, Mr. Ward?

"*A.* Positive.

"*Q.* Then, you understand by testifying today in the matter that you did, you have implicated yourself in a crime?

"*A.* Yes.

"*Q.* And, you want me to understand that nothing has been promised you?

"*A.* Yeah, nothing has been promised.

"*Q.* Nothing has been promised?

"*A.* No.

"*Q.* Have you [seen] Kent Taylor over at the county jail since you have been in there five months?

"*A.* A couple of times.

"*Q.* Have you talked with him?

"*A.* Yeah.

"*Q.* Did you talk about this incident?

"*A.* No, not too much.

"*Q.* What did you mean, no, not too much?

"*A.* We talked about it, but not, you know like we talking now.

"*Q.* Uh huh. Do you recall telling him that you had to testify?

"*A.* Yes.

"*Q.* Do you recall telling him that, do you recall telling him why you had to testify?

"*A.* No.

"*Q.* You don't recall telling him that?

"*A.* No.

"*Q.* Just the fact that you had to testify. Is it that you don't recall telling him why you had to testify?

"*A.* Well, I told him I had to testify because I didn't tell him why, but I felt I had to satisfy—get myself out of it.

"*Q.* Uh huh. To save yourself?

"*A.* Yes.

"*Q.* What do you think you're saving yourself from?

"*A.* I don't know.

"*Q.* Oh come on now. What do you believe you're saving yourself from, Mr. Ward?

"*A.* I believe I'm saving myself from a life sentence.

*"Q.* Sure, the police officer didn't tell you this?
*"A.* No."

In the instant case, defense counsel had the opportunity to pursue and did pursue a line of questioning designed to give the jury information on which to determine credibility of an accomplice. The instant case is clearly distinguishable from *People v Evans, supra.*

The record discloses that the defense did not move for a new trial, predicated upon the March 5, 1971 affidavit of Robert Ward.

In *People v Nettles,* 41 Mich App 215 (1972), the trial judge, the prosecutor, and defense counsel were all aware of the plea bargains struck by the witnesses. The only relevant *dramatis personae* ignorant of those facts were the members of the jury. So far as it appears from the record in this case, neither the trial judge nor defense counsel knew for a certainty that any bargains had been struck between the witnesses and the prosecutor. There is no indication in the record as to whether or not the assistant prosecutor had personal knowledge of these deals. Indeed, whether the assistant prosecutor had such knowledge or not would appear to be irrelevant, as a matter of constitutional law.

The case before us can be distinguished from *Giglio v United States,* 405 US 150; 92 S Ct 763; 31 L Ed 2d 104 (1972). In *Giglio,* the Court noted that Taliento's testimony was a *sine qua non* of the prosecution's case; without his testimony, the trial court would have been obliged to enter a directed verdict of acquittal based on the insufficienty of the evidence. In the instant case, even without the testimony of Ford and/or Ward, there was ample evidence to justify a verdict of guilty. The jury had been given facts which showed that two black

men, one tall and slender, the other shorter and heavier, murdered Fred David Otto without justification or excuse. Defendant, a black man, is tall and slender; his alleged accomplice, of whom the jury could take a view without hearing any testimony, is shorter and heavier. Defendant's palm prints were found on decedent's automobile in a position where at least one of the assailants was known to have placed his hands. At least one witness stated that the taller, more slender assailant fired the fatal shot. This evidence, standing alone, was sufficient to justify a return of a verdict of guilty by the jury, in contrast to the situation in *Giglio.* Stretching the corroborative evidence rule slightly, the dereliction of duty attributable to the office of the prosecutor in failing to present to the jury evidence of the bias of witnesses Ford and Ward was not a reversible error. *Cf. People v Collins,* 43 Mich App 259 (1972), citing MCLA 769.26; MSA 28.1096; GCR 1963, 529.1; *People v Budd,* 279 Mich 110 (1937); *People v Wolke,* 10 Mich App 582 (1968).

In distinguishing *Giglio v United States* and in finding that the error in this case was harmless, this Court must be convinced that the error was harmless beyond a reasonable doubt. Our Supreme Court recently said:

"We regard the strictures of MCLA 769.26 and GCR 1963, 529.1, as different articulations of the same idea; appellate courts should not reverse a conviction unless the error was prejudicial. As stated in *Nichols, supra* [341 Mich 311 (1954)], ' * * * the rule always in effect in Michigan, * * * has been and is that the question of reversal is controlled by determination of whether the error was prejudicial.'

"In determining prejudice in an error there are many considerations. As pointed out by former California

Chief Justice Roger Traynor, in his book *The Riddle of Harmless Error* (Ohio State Univ Press ed 1970), p 17:

" 'A large word like justice incorporated into a rule governing harmless error, compels an appellate court to concern itself not alone with a particular result but also with the very integrity of the judicial process.'

"The appropriate considerations are described in *People v Wichman,* 15 Mich App 110, 116 (1968):

" 'Where it is claimed that error is harmless, two inquiries are pertinent. First, is the error so offensive to the maintenance of a sound judicial process that it never can be regarded as harmless? See *People v Bigge* (1939), 288 Mich 417, 421; *People v Berry* (1968), 10 Mich App 469, 474; *People v Mosley* (1953), 338 Mich 559, 566. See, also, *Chapman v California* (1967), 386 US 18, 23, 24 (87 S Ct 824, 17 L Ed 2d 705) rehearing denied, 386 US 987 (87 S Ct 1283, 18 L Ed 2d 241). Second, if not so basic, can we declare a belief that the error was harmless beyond a reasonable doubt? See *People v Liggett* (1967), 378 Mich 706, 716, 717; *Chapman v California, supra.*' " *People v Robinson,* 386 Mich 551, 562–564 (1972).

The fact that an accomplice-witness hopes or expects that he will secure a mitigation of his own punishment by testifying on behalf of the prosecution does not disqualify him. *United States v Vida,* 370 F2d 759 (CA 6, 1966), *cert den* 387 US 910; 87 S Ct 1695; 18 L Ed 2d 630 (1967). See *People v Brooks,* 35 Mich App 594, 595 (1971). Recanting affidavits of witnesses who attempt to prove that they perjured themselves at trial must be carefully scrutinized. *People v Smallwood,* 306 Mich 49 (1943); *People v Krogol,* 29 Mich App 406 (1971).

Defendant further contends that reversible error was committed in his trial concerning his right to remain silent, due to the replies made on cross-examination by a testifying police officer:

"*Q.* And do you recall, sir, that you asked him to go with you down to City Police Station?

"*A.* Yes, sir.

"*Q.* And do you recall telling him that he didn't have anything to worry about?

"*A.* Yes, sir.

"*Q.* Do you recall telling him that he didn't look like the man they were looking for, or something you wanted to take him downtown for?

"*A.* Yes, sir.

"*Q.* He went voluntarily, didn't he?

"*A.* No sir, not exactly voluntarily, no sir.

"*Q.* Did you have to handcuff him?

"*A.* No sir, *he said he wasn't going to talk* and did I have a warrant to arrest him and I said at that particular time I didn't. But I would get a warrant to arrest him for murder." (Emphasis added.)

No objection was made at the time of this testimony, to which error is now attributed.

In the instant case, the offending statement by the officer cannot be said to have vitiated the whole process of trial. The allegedly erroneous remark came in the middle of a sentence, in response to a question posed by defense counsel. In all fairness to the defendant, it should be noted that the answer was not particularly responsive to the question. The prejudicial effect of this inadmissible evidence could have been eliminated by a curative instruction. From a reading of the entire record it does not appear that this remark by the witness contributed to defendant's conviction. This case is a proper one for the application of the harmless error rule. See *People v Wilkie,* 36 Mich App 607, 610–612 (1971); Cf. *People v Shugar,* 29 Mich App 139, 144–145 (1970); *People v Jew,* 21 Mich App 408 (1970).

Another claimed error is the alleged intimidation of witness Franklin Wells by a police sergeant, when the sergeant told Wells either to make a statement or be arrested. Defendant cites

*People v Pena,* 383 Mich 402 (1970) in support thereof. In *Pena,* the prosecuting attorney had written a letter six days before trial, addressed to the noticed alibi defense witnesses, in which the penalty statute for perjury was quoted. In the case before us, defense counsel was perfectly free to inquire into the bias of the witnesses Ward and Ford, and to argue their bias to the jury, an opportunity of which advantage was duly taken by alert defense counsel. In fact, the able trial judge made no ruling whatsoever on this issue, but permitted defense counsel a free rein.

Nor does Ward's affidavit, in which he admits to perjuring himself at defendant's trial, aid defendant's argument on this issue. First, the affidavit is palpably and grossly violative of fact and logic. Ward swears, "They made me say that Kent Taylor did it, but I really don't know who did it". This flatly contradicts Ward's plea of guilty in the charge of murder of Fred David Otto. Assuming arguendo that Ward's affidavit is properly before this Court on this appeal, the truth of the averments contained therein must be seriously doubted. The general rule in Michigan is that a new trial will not be granted based on evidence tending to show the perjury of a witness. *People v Harris,* 31 Mich App 100, 102 (1971). Furthermore, any intimidation of witness Wells did not interfere with the defendant's right to call witnesses in his own behalf, since Wells was a prosecution witness.

This case appears to be a matter of first impression in this state, as to whether the prosecutor's conduct (in threatening a witness with arrest should he fail to make a statement) was intimidation as a matter of fact, and what defendant's legal remedy is, to redress this alleged wrong. A search of multijurisdiction digests and annota-

tions, including CJS, Am Jur 2d, and ALR3d, reveals that the law concerning intimidation of witnesses is not well settled, for the reason that very few cases ever raised the issue. Nor do any of the annotations under 18 US Code, § 1503, the obstruction of justice statute, reach the issue raised on this appeal, although *Berra v United States,* 221 F2d 590 (CA 8, 1955), *aff'd,* 351 US 131; 76 S Ct 685; 100 L Ed 1013 (1956), held that a person is not a witness under this statute if, at the time of the alleged influencing, he had no desire, intent, or expectation of testifying in the case. At the time of the alleged intimidation, Wells was such a witness. However, this decision seems to be poor precedent in light of *People v Pena,* which indicates a strong desire that the integrity of the judicial process not be denigrated by testimony procured or prevented by intimidation of witnesses.

This appeal condenses to the question of whether or not a miscarriage of justice occurred because a prosecution witness may have been intimidated. Testimony of Wells placed this defendant near the scene of the crime at the time of the crime, and connected this defendant with decedent's automobile. In this respect, Wells' testimony corroborated that of Ward. Thus, Wells' testimony was merely cumulative and, if admitted improperly, its receipt into evidence may be harmless error. Especially is this true where defense counsel was aware of the alleged intimidation at the time of trial, but made no demand for an investigation, mistrial, or special instruction to the jury. In essence, the fact that Wells may have been intimidated into giving false testimony was a matter relating to his credibility as a witness. Failure to

raise this issue in some manner during the trial will, on the facts of this case, preclude the raising of an allegation of error for the first time on appeal. See *Powell v United States,* 35 F2d 941, 943 (CA 9, 1929).

Nevertheless, this Court condemns the actions of the prosecutor and the police in this respect. The cross-examination by defense counsel suggested no inconsistencies between the earlier statement and the witness's trial testimony, and he made no further attempt to preserve this issue for appeal.

Defendant also alleges that the jury was excused and the trial adjourned from 1 p.m., March 16, 1970, to 9:31 a.m., March 18, 1970. No instructions were given to the jury at that time with respect to discussing the case or reading or hearing anything about it outside the courtroom. When trial was adjourned from March 18 to March 23, 1970, the trial court instructed the jury, "Don't talk about this case with anyone." Defendant offers no evidence, within or outside the record, indicating that the jurors did in fact discuss the case among themselves, with others, or that they read anything about it. Defendant has never indicated dissatisfaction with the adjournment procedures until filing this appeal. While the trial judge should have been more careful in reminding the jury not to discuss the case, the defendant made no showing of prejudice resulting from such adjournments. His claim of error in this regard is not now well-founded, and reversal is not required. *People v McIntosh,* 6 Mich App 62, 71 (1967).

The guilt of the defendant was substantially proven. There was no miscarriage of justice.

Conviction affirmed.

All concurred.