**STATE of Iowa, Appellee,**

v.

**Mel B. IVY, Appellant.**

**No. 63549.**

Supreme Court of Iowa.

Jan. 14, 1981.

James F. Whalen of Dunbar & Dunbar, Waterloo, for appellant.

Thomas J. Miller, Atty. Gen., and John Messina, Asst. Atty. Gen., for appellee.

Considered by LeGRAND, P.J., and UHLENHOPP, McCORMICK, LARSON and SCHULTZ, JJ.

LeGRAND, Justice.

Having waived trial by jury, defendant was convicted in a bench trial of having inflicted willful injury upon Abner J. Lewis in violation of section 708.4, The Code 1979. He appeals, and we affirm the trial court.

The facts leading up to defendant's trial and conviction are bizarre indeed. Defend-

ant and his victim were close friends; they still are. On the evening of April 6, 1978, they became involved in an argument over defendant's conduct toward the daughter of the woman with whom Lewis was living. Lewis ordered defendant to leave the house. An altercation followed and Lewis shot defendant, once through the arm and once in the buttocks. Defendant went to his car and got a loaded rifle with the express intention of killing Lewis. However, he was dissuaded from doing so. He then went to a hospital, where he was treated for his injuries. While there, he was questioned by a detective concerning the shooting. He told the officer not to worry about it because the matter would be taken care of. In another conversation Lewis told a doctor she would know who shot him "by this time tomorrow." The following morning the defendant sought out Lewis and shot him, inflicting injuries which are both serious and permanent.

Defendant raises these three issues, all relating to the testimony of Melvin Dunn and Melvin Brown:

(1) The county attorney violated the rules of Criminal Procedure by issuing subpoenas for Dunn and Brown under rule 5(6), Iowa R.Crim.P., without complying with rule 13(1) of said rules.

(2) The trial court abused its discretion by permitting the state to recall Dunn and Brown as witnesses.

(3) The county attorney was guilty of prosecutorial misconduct by intimidating and threatening Dunn and Brown before they testified on recall.

I. *Violation of Rules of Criminal Procedure.*

We make short work of the alleged violation of rule 5(6), Iowa R.Crim.P., which permits witnesses to be subpoenaed to appear before the county attorney for purposes of investigation. When this rule is resorted to, another rule (13.1, R.Crim.P.) gives a defendant the right to be present and to cross-examine.

■ Defendant is wrong in asserting the county attorney used the subpoena powers of rule 5(6). The witnesses in question—Melvin Dunn and Melvin Brown—were subpoenaed to testify at trial under rule 14, R.Crim.P. They were not summoned to the county attorney's office for investigative purposes. There is no principle denying either the state or the defendant the right to confer with a witness who has been subpoenaed to testify. There is no merit to this complaint.

II. *Abuse of discretion in allowing state to recall witnesses.*

We find no merit, either, in defendant's insistence the trial court erred in allowing the state to recall Dunn and Brown.

■ This is a matter resting largely within the trial court's discretion. The state had not yet rested; the witnesses were recalled to correct or explain testimony already given; and the defendant had unlimited opportunity to cross-examine. *See State v. Folkens*, 281 N.W.2d 1, 6 (Iowa 1979); *State v. Hall*, 235 N.W.2d 702, 724 (Iowa 1975). We reverse only for an abuse of discretion. *State v. Droste*, 232 N.W.2d 483, 488 (Iowa 1975). We find no abuse here.

III. *Prosecutorial Misconduct.*

This brings us to the only troublesome question raised by defendant. Was there prosecutorial misconduct in the recall of these witnesses? If so, is defendant entitled to a new trial? We have said it is not the misconduct itself which gives defendant a right to relief; it is the prejudice which results therefrom. *State v. Hall*, 235 N.W.2d at 712.

The matter arose this way. Both Dunn and Brown failed to identify defendant as the person who shot Lewis, although each had given a written statement shortly after the shooting in which he had done so. After they had been discharged as witnesses, they were served with new subpoenas to appear again the following day. Before putting them back on the stand, the county attorney conferred with each of them and

showed them their prior statements. They then identified defendant as the assailant.

The sole purpose of the recall was to have them make this identification. This would, at first, seem immaterial as defendant testified, admitting he had shot Lewis. However, he now argues he was compelled to testify because of the belated identification made by Dunn and Brown, without which the state had no case. We consider the situation relating to each witness separately because the circumstances vary.

*Recall testimony of Melvin Dunn*

Dunn originally said he was present with Abner Lewis (the victim) when defendant came "across the sidewalk." He appeared to be carrying a stick. (The witness suffers from poor eyesight.) Defendant told Dunn "to get back." Immediately after that Dunn heard a gun "go off." He said he was excited and did not know exactly what happened.

We set out part of his original testimony:

Q. Did you see Mr. Ivy [the defendant] shoot Mr. Lewis?

A. It was done so quick, I wouldn't say yes and I wouldn't say no. It was so quick. I got more excited.

Q. Did you see Mr. Ivy have a rifle that day? You said you thought he had a stick?

A. Yes. I thought it was a stick. I don't know whether it was a rifle or not myself.

. . . . .

Q. Do you know why [defendant] told you to get back?

A. He didn't want to shoot me, I reckon.

. . . . .

Q. Do you know who shot Mr. Lewis that day?

A. For being sure, I don't. Like I said, I got excited. I don't know.

Q. You aren't sure who shot Mr. Lewis?

A. No, I'm [not].

Before Dunn testified on recall, the county attorney talked with him in his office. He showed Dunn a statement he had given shortly after the shooting which was inconsistent with his original trial testimony. He told Dunn to "tell the truth." He did not threaten him or suggest possible criminal prosecution. He asked if Dunn remembered things more clearly after reading his statement, and Dunn said he did.

On recall, this witness testified, over timely objection that he had been intimidated and threatened, as follows:

Q. Mr. Dunn, you remember testifying yesterday don't you?

A. Yes.

Q. Now just for a couple questions . . . there might be some misunderstanding; were you at the scene at the time A.J. Lewis was shot?

A. Yes, I was.

Q. Did you see Mr. Lewis shot?

A. Yes, I did.

Q. Did you see Mr. Ivy at the scene?

A. Yes, I did.

. . . . .

Q. When Mr. Ivy came on the scene, how did he arrive?

A. He arrived in his car. I went to him. I picked up a pipe and was playing with him. Then he told me to step back, get back. I stepped back and I heard him say, "I told you I was going to get you." Then he shot.

Q. Who shot A.J. Lewis?

A. Ivy.

CROSS EXAMINATION

BY MR. DUNBAR:

Q. Mr. Dunn, how many people were present at this time?

A. I wouldn't know how many there were. I don't have any idea how many there were there. I don't know how many there were there.

Q. What time of the day was this?

A. I don't recall what time. I didn't have no watch.

Q. Had you been drinking that morning, Mr. Dunn?

A. Yes, I had a few drinks. Yes, I did.

Q. You don't see very well, do you, Mr. Dunn, do you?

A. Not too good.

Q. And in point of fact, you didn't think Mr. Ivy had a gun in his hands at all, did you, when he first got there?

A. When I was playing with him with the stick, I didn't know what it was. He told me to get back. I knew it was a gun when he shot and he fell over.

Q. When he told you to get back?

A. Yes.

Q. Where did you direct your attention?

A. I went behind the tree.

Q. Did you see Mr. Ivy shoot Mr. Lewis?

A. Yes.

Q. From behind the tree?

A. From the side.

Q. And you are certain about that?

A. I am certain.

Q. Is there any reason you weren't certain of that yesterday?

A. Well, yesterday I was kind of shook up. I couldn't remember just right. It caught me right offhand.

Q. And you are not shook up today?

A. Not too much.

*Recall testimony of Melvin Brown*

The recall of Melvin Brown presents a somewhat different situation. When first testifying, Brown said he knew both Abner Lewis and defendant. He was at the scene of the shooting when defendant drove up, got out of his car, and said to Brown, "I'm going to shoot. Backup. You are in the way." Brown heard a shot and then saw Lewis on the ground. However, Brown denied seeing defendant shoot Lewis.

On recall Brown stated the county attorney had shown him the written statement he gave shortly after the shooting. A police officer was present at the meeting in the county attorney's office. They told him he might be charged with a criminal offense if he didn't tell the truth. Either directly or indirectly, the witness was made to believe the "truth" was as outlined in the written statement.

In his recall testimony, Brown said defendant got a gun from his car and started shooting. He "blasted" Lewis. He explained not having said this before by the fact he was "kind of nervous" when he first testified.

This also occurred when the county attorney examined Brown:

Q. Let me get this clear. Did I tell you, Mr. Brown, to come to the witness stand and tell the truth?

A. I beg your pardon?

Q. Did I tell you to tell the truth?

A. Did you tell me to tell the truth?

Q. When you were up here today?

A. You told me to tell the truth and telling a lie could bring some type of charge.

Q. I said if you told a lie there were criminal charges available?

A. Right.

Q. When I asked you to come to the stand, did I tell you to tell the truth?

A. Yes, that's what you were looking for. I told you this morning.

Q. When I showed you this statement, did you remember this statement?

A. Yes, I read it.

Q. Did you read it more than once?

A. Yes, in the office.

Q. Did you read it without my presence? Did you look at it while I wasn't present there?

A. I said when you were there and told me to go outside and sit on the outside and read it.

Q. Is that statement true?

A. To my best thinking it is.

Q. Anything on there that isn't correct? You want to change as far as causing you to remember anything?

A. No.

Q. Did the policeman force you to make a statement that day? Did Mr. Thompson [the policeman] force you to make a statement or did you voluntarily tell what happened?

A. No. He come out and told me to come down to make a statement on the incident.

Q. Did he ask you to tell the truth about what happened?

A. Yes, that's what he was looking for. That's what I told him.

This witness was certainly threatened with criminal prosecution if he didn't tell the "truth." Courts universally condemn the tactics used here by the state. *United States v. Smith*, 478 F.2d 976, 978–79 (D.C. App. 1973); *Bray v. Peyton*, 429 F.2d 500, 501 (4th Cir. 1970); *People v. Taylor*, 46 Mich.App. 259, 207 N.W.2d 899, 906–07 (1973); *People v. Pena*, 383 Mich. 402, 175 N.W.2d 767, 768 (1970).

 We agree with the rationale of these cases which hold it is improper to intimidate a witness. We agree, too, that, if prejudice results, a defendant is deprived of due process. As the court said in *Pena*, "A prosecutor may impeach a witness in court but he may not intimidate him—in or out of court." 175 N.W.2d 768, quoted with approval in *Smith*, 478 F.2d at 979. However, defendant is not entitled to a new trial in the present case because he was not prejudiced by the challenged testimony. It should be borne in mind defendant's complaint is that the belated identification testimony compelled him to take the stand. He says he would not have done so otherwise. We reject that argument. We do not overlook the fact the state considered the evidence important enough to warrant the recall of these witnesses. Nevertheless, there was solid identification of defendant as the assailant without that testimony. The same reasons which impelled defendant to testify *after* the recall testimony would have demanded that course *without* such testimony.

The two controversial witnesses—Dunn and Brown—had given testimony originally from which the identification of defendant as the assailant was inevitable. They had balked only at saying in so many words that he had done the shooting. He was placed at the scene; he had a gun; he told others to get away; he said he was going to shoot; he departed the scene immediately after the shots were fired.

Defendant ignores, too, the testimony of Janice McVay that the victim, while awaiting the arrival of the ambulance after the shooting, said the defendant had come back to get him. In addition, the record includes the incriminating statements made by defendant at the hospital while being treated for his own wounds. There he had said he would "take care" of the matter himself; and also that everyone would know who shot him "by this time tomorrow."

We recognize defendant and his counsel must decide trial tactics, including whether defendant should testify. By the same token, it is our responsibility to decide if defendant was prejudiced by the recall testimony of Dunn and Brown. We hold he was not. While their evidence on recall added cumulative proof of defendant's identification, the state's case without it was formidable, if indeed not overwhelming. The judgment is affirmed.

AFFIRMED.