# IN THE COURT OF APPEALS OF IOWA

No. 15-0666
Filed January 11, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BRIAN HEATH DAVIS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Fremont County, Timothy O'Grady,

Judge.


        A defendant appeals his conviction for murder in the first degree.

**AFFIRMED.**


        Patrick A. Sondag of Sondag Law Office, Council Bluffs, for appellant.

        Thomas J. Miller, Attorney General, and Kyle P. Hanson, Assistant

Attorney General, for appellee.


        Heard by Vogel, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

Following a bench trial, the district court found Brian Davis guilty of first-degree murder in the death of his fiancée, Holly Durben. On appeal, Davis raises four issues: (1) insufficient evidence; (2) improper rulings regarding expert-opinion testimony and prior bad acts; (3) improper denial of his motion for new trial; and (4) ineffective assistance of counsel concerning the recall of a witness, expert-opinion testimony, and prosecutorial error.

Finding substantial evidence in the record to support the elements of murder in the first degree, we reject Davis's call for acquittal. Discerning no abuse of discretion in the court's evidentiary rulings or in its denial of his new-trial motion, we affirm Davis's conviction. We conclude Davis's trial counsel did not breach an essential duty by failing to object to the State's recall of a witness or to the prosecutors' statements during closing arguments. But because further development of the record is needed to assess Davis's ineffective-assistance-of-counsel claim related to the medical examiner's testimony regarding the location of Durben's shotgun wound, we preserve it for possible postconviction-relief proceedings.

**I.      Facts and Prior Proceedings**

On the morning of July 18, 2009, local law enforcement officers arrived at the Shenandoah farmhouse shared by Brian Davis and Holly Durben after Davis reported to dispatch that Durben shot herself in the head. In an upstairs bedroom, two Fremont County deputies found Durben's body prostrate on the bed with a massive gunshot wound to the left side of her head. Durben's left hand was on the pistol grip of a twelve-gauge shotgun with an eighteen-inch

barrel, and her left thumb rested on the trigger.[1]  Although the gun was in Durben's hand, the only fingerprint suitable for identification on the gun belonged to Davis.  In their inspection of the scene, officers saw a broken mirror in a bathroom, Durben's engagement ring on the kitchen floor, and an empty box of ammunition along with a few empty twelve-gauge casings in the yard.

Paramedics attended to Davis, who was "thrashing" on the highway adjacent to the home.  Davis smelled strongly of alcohol and appeared to be losing consciousness.  Before transporting Davis to a nearby hospital, paramedics administered oxygen and Narcan, a drug used for narcotic overdoses.  His blood alcohol concentration (BAC) measured .245.

Victor Murillo, an Iowa Division of Criminal Investigation (DCI) criminalist, examined the shotgun found in Durben's hand.  He discovered a shell casing still inside the gun, which he noted was consistent with suicide because a shell casing must be manually discharged after firing a shotgun.  Murillo testified it was possible to fire the gun one-handed, but it would be more difficult to hold.  He concluded the gun's placement was consistent with Durben having shot herself but did not opine on who fired the gun or whether the gun had been manipulated after it was fired.

Associate State Medical Examiner Dr. Jerri McLemore performed the autopsy on Durben.  Dr. McLemore found the entrance wound was consistent with a shotgun fired at very close distance or in contact with the skin on Durben's left cheek.  The doctor noticed areas of faint discoloration on both the right and

---

[1] Durben was right-handed.

left sides of Durben's jawline and on the lower part of her neck. Dr. McLemore discussed the marks, explaining:

> [F]or anyone that comes in with a possible self-inflicted wound, especially if she is a woman, a neck exam is always important to make sure that there is no bruising of the neck that may indicate something that might have happened prior or that might add to the circumstances. In this case, there were areas of discoloration that actually had bleeding into the soft tissue underneath, especially on the left hand side that because of their location, symmetrical on the jawline and down at the . . . lower part of the neck were concerning for a possible pressure against the neck in these areas, such as a what's call[ed] a sleeper hold.[2]

In addition, Dr. McLemore observed petechaie—pinpoint bleeding—in Durben's right eye crevice.[3] According to the doctor, although petechaie in the eyes may be present in a variety of circumstances, they "most notably [occur] in what we call asphyxia deaths, where the brain and the tissues in the body have been deprived of oxygen in some manner." The doctor acknowledged gunshot wound deaths, particularly when the trauma is close to the eye, could also cause petechaie in the eyes but only "about a quarter of the time." Dr. McLemore found a small number of blunt force injuries on the rest of Durben's body, including a small red bruise on the inside of Durben's left forearm and a small scrape on her right forearm, but Dr. McLemore was unable to determine how or when those

---

[2] Dr. McLemore described a "sleeper hold" as

> when someone is behind another person and their arm goes across the front and side parts of the neck. If it's placed correctly, the big muscle in the upper arm, the bicep . . . if they are right-handed, should be against the right side of the neck pressing against the vessels that supply blood to the brain. The forearm should be then—be placed against on the left aspect of the neck where the arm is pressing—the forearm muscles are pressing against the left . . . side vessels in the neck.

According to Dr. McLemore, the victim of a sleeper hold may pass out in a few seconds.

Davis—experienced in the martial arts—was familiar with the sleeper hold. In fact, just hours before Durben's death, Davis put a friend, Scott Carpenter, in a "rear naked chokehold" to demonstrate how to escape from the maneuver.

[3] Durben's left eye was damaged due to its vicinity to the shotgun wound.

injuries occurred. Finally, Dr. McLemore measured Durben's BAC at .034 from her heart blood and .089 from her urine. She noted the urine level was likely higher than Durben's actual concentration at the time of her death. Dr. McLemore concluded:

> Because of the location of the shotgun wound, which is highly unusual for a self-inflicted shotgun wound, because of the partial bruising of the neck, which I had no good answer as to why they were there, I could not say one way or the other whether Ms. Durben actually did die of a shotgun wound to the head.
>     I could not say whether or not she might have been incapacitated beforehand. And so because of that, I could not determine the cause or manner of death. They were both undetermined.

Agents with the DCI interviewed Davis four times about the events leading up to Durben's death. Three of the interviews were within a week of Durben's death;[4] the last interview occurred over five years later, on October 27, 2014. According to Davis's accounts, his friend, Scott Carpenter, stopped by after work on July 17, 2009, and the two were together until Carpenter left around sunrise on July 18. They began the evening by drinking beer while Davis tended the grill. Later on, Davis and Carpenter took target practice at a stump in the yard with Davis's shotgun. Afterward, Davis stowed the gun, unloaded, under the bed he shared with Durben. Davis and Carpenter played video games for several hours.

Davis told authorities Durben, who "had drank a lot of . . . bourbon that evening," became angry when she saw he had a picture of her sitting on a toilet displayed as the background for his video-game console, hit Davis, and called Davis and Carpenter "assholes." At some point Durben broke the bathroom

---

[4] Davis's third interview was scheduled as a polygraph examination. After observing Davis's "erratic breathing" and emotional state, the examiner did not administer the polygraph but did continue with the interview.

mirror, according to Davis.[5] In the early hours of July 18, Davis and Carpenter left the house to go for a drive and "cut a couple cookies" in a nearby pasture. Soon after they returned to the house, Carpenter left. Davis slept on the couch and got up after a few hours to make breakfast. Davis recalled asking Durben if she wanted anything, "she said 'no' and 'fuck you.'" Davis finished making breakfast, and Durben called for him. He told investigators that as he climbed the stairs, he heard the shotgun go off. He said he ran to Durben's body, moved the gun slightly, and shook her before calling the police.

On November 7, 2014, a little more than a week after Davis's final interview, the State charged him with first-degree murder. At his bench trial, the State argued Davis killed Durben either by shooting or strangling her and then manipulated the scene to make it appear Durben had committed suicide. The defense maintained Durben took her own life. The district court found Davis guilty, specifically discrediting Davis's statements and placing particular importance on the marks on Durben's neck. The court concluded:

> I am firmly convinced that Durben did not kill herself. I am firmly convinced despite the uncertainty in the medical evidence because I have been able to consider all of the evidence including Davis'[s] own statements. I am firmly convinced that Brian Davis choked Holly Durben [and] then shot her.

Davis now appeals.

---

[5] While Davis consistently told DCI agents Durben broke the bathroom mirror that night, he was inconsistent about the specifics of his argument with Durben. Davis first suggested Durben "was jealous or something or had some aggression or something." In the next interview, Davis similarly attributed the argument to Durben's feeling he wasn't paying enough attention to her. Davis provided details about the picture of Durben on the toilet in the third interview. But in the last interview, he stated he didn't remember Durben slapping him and recalled their dispute as "not verbal" until he asked Durben if she wanted breakfast that morning.

## II.    Scope and Standards of Review

We review challenges to the sufficiency of the evidence for correction of legal error.  *See State v. Hansen*, 750 N.W.2d 111, 112 (Iowa 2008).  We view the record in the light most favorable to the State, and we make all legitimate inferences and presumptions that may reasonably be inferred from the evidence. *See State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005).  We will uphold the district court's verdict as long as substantial evidence supports it.  *See State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016).  "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt."  *Hansen*, 750 N.W.2d at 112.

We review evidentiary challenges for an abuse of discretion.  *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015).  We find an abuse of discretion "when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable."  *See id.* (quoting *State v. Miller*, 841 N.W.2d 583, 586 (Iowa 2014)).  "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law."  *State v. Redmond*, 803 N.W.2d 112, 117 (Iowa 2011) (quoting *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000)).

We also apply the abuse-of-discretion standard to rulings on motions for new trial alleging a verdict is contrary to the weight of the credible evidence. *See State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016).  "[A] district court may invoke its power to grant a new trial on the ground the verdict was contrary to the weight of the evidence only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered."  *Id.*  Unlike under the

sufficiency-of-the-evidence standard, the court may weigh the evidence and consider witness credibility. *State v. Taylor*, 689 N.W.2d 116, 134 (Iowa 2004). But our review is limited to a review of the trial court's exercise of discretion and does not extend to the underlying weight-of-the-evidence question. *See Ary*, 877 N.W.2d at 707.

Finally, we review ineffective-assistance-of-counsel claims de novo. *See State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).

III. **Analysis**

A. **Did the State present substantial evidence to support Davis's conviction?**

To prove Davis was guilty of first-degree murder, the State was required to show that on or about July 18, 2009, Davis "did willfully, deliberately, and with premeditation kill Holly Rae Durben." *See* Iowa Code § 707.2(1) (2009).

Davis argues the State did not adequately prove he killed Durben considering the lack of physical evidence linking him to her death. As Davis notes, Dr. McLemore could not determine the cause or manner of death, investigators found no evidence the gun had been wiped of prints, criminalist Murillo cited no evidence related to the gun's position or manner of firing suggesting Durben had not killed herself, and the State did not test Davis or Durben for gunshot residue. Davis claims the district court "sculpted evidence and credibility assessments to support guilt, disregarded or misstated what detracted from it, arbitrarily rejected incontrovertible medical and scientific evidence, and made findings outside its expertise without record evidence support."

The State accuses Davis of "miss[ing] the point of a sufficiency-of-the-evidence review" and endorses the district court's findings: "Even though Davis presented a suicide theory to defend against the State's evidence of murder, it was the district court's role to decide which evidence or theory was more credible." *See State v. Weaver*, 608 N.W.2d 797, 804 (Iowa 2000) ("Determinations of credibility are in most instances left for the trier of fact, who is in a better position to evaluate it."). We agree the district court acted properly within its fact-finding role to convict Davis.

At trial, the State's proof fit into four categories: (1) evidence demonstrating Davis's intent and motive, (2) expert testimony and forensic evidence either associating Davis with the murder or debunking the suicide theory, (3) evidence suggesting Durben lacked suicidal ideation, and (4) evidence indicating Davis tried to cover up his involvement in Durben's death. Although no one piece of evidence conclusively proved Davis's guilt, taken as a whole, we find the testimony of the State's witnesses, along with the State's exhibits, provided the district court with sufficient evidence to find beyond a reasonable doubt that Davis committed murder. We discuss each category of evidence in turn.

To show intent and motive, the State presented evidence of Davis's prior abuse of Durben.[6] One year before Durben's death, Fremont County Sheriff

---

[6] Davis argues the court impermissibly used these prior bad acts to influence its view of the rest of the evidence presented at trial: "What is certain is that ultimate finding relied on bad acts evidence depicting [Davis] as abusive and especially inferring he choked Durben before." As we discuss below in the evidence section, we find the court did not abuse its discretion in admitting proof of the prior bad acts. But even if the evidence had been wrongly admitted, it must be considered in our sufficiency analysis. *See State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003).

Kevin Aistrope arrested Davis for domestic-abuse assault after seeing Durben with a black eye and redness on the sides of her neck. Two months later, a weeping Durben flagged down a passing vehicle late at night on the highway near her home, which led to Davis's arrest for violation of a civil protective order. Tracey Waters, an acquaintance of Durben, also observed Durben with injuries—black eyes and bruising on her arm. And at some point in 2009, Waters saw Davis grab Durben "from behind her head" at a local bar and "drag[] her across the bar [by her hair] to the back door." Durben's sister, Heather Richardson, commented on Davis's controlling tendencies: "After [Durben] moved in with Davis, she stopped calling. When I tried to call, he wouldn't allow me to talk to her. He actually bashed her windshield in, so she couldn't drive to come see us anymore." And just three weeks before Durben's death, Nephi Jones, a patrol officer for the Shenandoah Police Department, testified he witnessed, via surveillance footage, Davis "violently pushing" Durben.[7]

The State's proof of Davis's recent history of assaulting Durben supported its theory he had the motive and state of mind to commit murder. *See State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003) ("Evidence of bad feelings or quarrels between the defendant and the victim are circumstances that may be used to support a finding of malice aforethought."); *see also State v. Richards*, 809 N.W.2d 80, 94 (Iowa 2012) ("[I]t behooved the State to establish that Richards had a motive for murdering [his ex-wife]. The history of abuse helped the State do so, by showing that Richards wanted to control his ex-wife and,

---

[7] Jones initially testified: "I believe he choked her at one point." But after viewing the video, he corrected his statement: "I would say in the video that his hands come up to her neck, it appears as if he was going to choke her, and he violently pushes her away."

when he felt himself unable to do so, could become hostile and violent toward her.").

In marshaling its forensic evidence, the State emphasized the peculiarity of a medical examiner being unable to conclude a person with a "gaping shotgun wound to her head" died from a shotgun wound. The State highlights Dr. McLemore's opinion that the symmetrical discoloration on Durben's neck indicated Durben could have been incapacitated before her death with a "sleeper hold"—the same maneuver Carpenter described Davis demonstrating for him just hours before Durben's death. The State couples that opinion with Dr. McLemore's view that the location of Durben's shotgun wound was "highly unusual."[8] We agree Dr. McLemore's testimony set the stage for the State's theory of the crime.

Other forensic evidence from the investigation also suggested Durben did not take her own life. Although she was right-handed, her left hand held the gun's grip. And the only identifiable fingerprint on the gun belonged to Davis. Carpenter testified the shotgun was loaded and leaning against the kitchen wall of the home shared by Durben and Davis when he left in the early morning hours of July 18, which meant, to kill herself, Durben would have had to walk down the stairs, past Davis, and back up the stairs unnoticed in order to retrieve the gun from the kitchen. As the district court concluded, even if Davis had unloaded the

---

[8] Davis argues Dr. McLemore's statement regarding the "highly unusual" location of Durben's wound should be rejected because it lacked "supporting data, studies or even anecdotal evidence to assess reliability." While we agree additional context could make Dr. McLemore's statement more or less probative, we find this argument more appropriately addressed in the context of trial counsel's performance in making or not making the proper evidentiary objections.

shotgun and put it under the bed as he claimed, the defense theory of suicide was implausible:

> If Davis'[s] statements were truthful, Durben retrieved the shotgun from where it was kept under the bed, took a shell from the box of Kemen shells on the shelf next to the bed, closed the box and placed it neatly back on the shelf, loaded a shell into the chamber of the shotgun, positioned the shotgun, and pulled the trigger with the thumb of her non-dominant hand. While handling the shotgun, Durban did not leave any [identifiable] fingerprints.

The State also offered testimony that Durben lacked suicidal ideation. Her sister, Heather Richardson, testified about Durben's hopes and plans for the future. According to Richardson, she spoke with Durben just two weeks before her death about moving to Tennessee to live with her after the birth of Richardson's child. Richardson believed Durben was excited about reaching the end of her probationary period at a new job and qualifying for benefits—specifically, a program to help her stop smoking before she would be spending time with Richardson's baby.

Jamie Stockwell, a friend who heard from Durben just hours before her death, provided insight into both Durben's state of mind and the veracity of Davis's statements. In the early hours of July 18, 2009, Durben sent Stockwell a text message that read: "If I need a place to stay, can I?" Stockwell called back several times after receiving the text message and eventually spoke with both Durben and Davis sometime after 4:00 a.m. Stockwell described Durben as "hysterical, scared, and crying." "[Durben] said she was needing some help and she wanted me to help her and that she wanted me to help her get out of there and away from everything." Stockwell recalled Davis was "mad about everything" and was "upset" that Stockwell had called to talk with Durben.

Stockwell's testimony shows Durben was afraid in the hours leading up to her death, and importantly, it draws into question Davis's version of the evening, which minimized his hostility toward Durben.

We acknowledge the record contains conflicting testimony concerning Durben's suicidal ideations. For instance, Stockwell stated in her deposition that in their phone conversation on the morning of July 18, Durben told her "if she didn't get out of there or didn't have anywhere to go, then she was going to end up committing suicide." But at trial, Stockwell denied Durben threatened suicide that morning. Instead, Stockwell insisted Durben last mentioned suicide five months before when Durben told Stockwell she was "going to blow her head off." Stockwell attributed her inconsistent deposition testimony to her fear of Davis, who was present at her deposition. The district court found Stockwell's trial testimony credible, and we defer to that determination.

Carpenter, who was Davis's friend, testified that Durben said she was going to kill herself during the argument with Davis on the morning of July 18. Carpenter, who had met Durben only three or four times, also claimed that she had spoken of suicide around him on other occasions. The district court—noting Davis himself denied Durben had expressed an intent to commit suicide that morning—found Carpenter's testimony lacked credibility on this point, and we likewise defer to that determination.

Finally, we turn to the State's evidence that Davis was dishonest in his statements to law enforcement. The State presented recordings of Davis's DCI interviews, arguing inconsistencies between his statements and the other evidence presented at trial suggested Davis was attempting to cover up his

involvement in Durben's death. *See State v. Winemiller*, 411 N.W.2d 719, 720 (Iowa 1987) ("We note that a defendant's inconsistent statements are probative circumstantial evidence from which the [fact finder] may infer guilt.").

The district court found: "The biggest inconsistency in the evidence is Davis'[s] minimization of the conflict between him and Durben that night." Stockwell's testimony indicated a significant argument between Durben and Davis on July 18, 2009. Carpenter remembered Durben throwing her engagement ring during the argument as she wept. In contrast, in his first interview, Davis acknowledged Durben broke the bathroom mirror but denied a significant hostility between them, commenting Durben "was jealous or something or had some aggression or something." Even when he acknowledged in his third interview that Durben "smacked" him after seeing an embarrassing photograph, he diminished his own role in the dispute, saying: "I laughed . . . . I said I was sorry and I changed [the picture] and Scott was laughing and I told her I forgot it was on there." Further, Davis consistently emphasized Durben drank heavily throughout the night, causing her to behave erratically. But "Durben's alcohol content at the time of her death, even at the top end of the possible range was just over the legal limit to drive."

Davis's admissions to touching the shotgun when he discovered Durben's body could also be viewed as incriminating. In the three interviews immediately following Durben's death, Davis told DCI agents he had moved the gun to varying extents. His statements provided an excuse for finding his fingerprints on the gun and accounted for the possibility the positioning of the gun would not be consistent with suicide. As the district court noted: "There is no reason for Davis

to manipulate the scene of Durben's death without guilty involvement in her death." We agree Davis's own statements contributed to the array of evidence pointing to his guilt in Durben's death.[9]

Giving deference to the district court's credibility determinations and viewing the evidence in the light most favorable to the State, we find sufficient evidence in the record as a whole to convince a rational fact finder of Davis's guilt beyond a reasonable doubt. Accordingly, we affirm on this issue.

**B.** **Did the district court abuse its discretion in its evidentiary rulings?**

**Expert-Opinion Testimony.** Davis next contends the district court abused its discretion in allowing Dr. McLemore to testify the left cheek is "a highly unusual place for a self-inflicted shotgun wound" because the opinion was beyond the scope of the minutes of testimony.[10]

---

[9] The district court identified several "contrivances" by Davis, leading the court to conclude he lacked credibility. For example, Davis volunteered information to the 911 operator that he was downstairs when Durben shot herself, Davis responded positively to Narcan even though he had no narcotics in his system, Davis sobbed whenever questioned about the events leading up to Durben's death, Davis shook and panted throughout the interview when he expected to take a polygraph test in "a deliberate attempt to hyperventilate." Davis argues the court's determination Davis was feigning a reaction to Narcan lacked evidentiary support because the State offered no evidence about its effect in the absence of narcotics. Similarly, he argues the State failed to present expert testimony to support a finding Davis was trying to hyperventilate to avoid a polygraph. Even if we accept Davis's arguments on these two issues, the other inconsistencies cited by the court support its overall finding Davis was not credible in his statements to law enforcement.

[10] Davis also argues the testimony was impermissible due to a lack of foundation. The State contends Davis did not preserve error on this claim. We agree. After defense counsel objected to the testimony, the prosecutor asked: "Is the objection a foundation objection regarding [Dr. McLemore's] qualifications?" Defense counsel responded: "No. It's beyond the scope of the Trial Information and beyond the scope of the deposition." Davis failed to preserve error because counsel did not raise a clear objection or secure a ruling on a lack-of-foundation objection. *See* Iowa R. Evid. 5.103(a)(1); *State v. McPhillips*, 580 N.W.2d 748, 750 (Iowa 1998). Because Davis alternatively argues counsel mishandled this objection, we address the foundation issue below as a part of Davis's ineffective-assistance claim.

Minutes of testimony must include "a full and fair statement of the witness'[s] expected testimony." Iowa R. Crim. P. 2.5(3). To be sufficient, the minutes of testimony need only "alert the defendant generally to the source and nature of the evidence against him." *State v. Mehner*, 480 N.W.2d 872, 877 (Iowa 1992); *see also State v. Ellis*, 350 N.W.2d 178, 181 (Iowa 1984) ("The minutes need not list each detail to which a witness will testify . . . ."). Here, the minutes of testimony stated, in relevant part:

> Witness[] will . . . testify regarding the details of her examination and that she located a shotgun wound to the left cheek of the face . . . . Witness will testify that based on her clinical finding at autopsy as well as her consideration of the scene and circumstances as reported to her by law enforcement, that her opinion regarding cause and manner of death is undetermined.

Davis alleges "for identifying the shotgun wound's entry location, nothing in the entirety of the doctor's minutes gave any hint she had formed or would later give any opinion from that fact." Further, according to Davis, Dr. McLemore presented no opinion relevant to the location of the wound at her deposition. The State contends Davis had sufficient notice of Dr. McLemore's expected testimony because "[t]he minutes advised that she would testify about the location of [Durben's] gunshot wound and give her opinion on the cause and manner of death."

We agree Davis had adequate notice here. The minutes of testimony indicated Dr. McLemore would testify "regarding cause and manner of death." Her explanation at trial for finding the cause and manner of death undetermined could be reasonably expected from the minutes.

We further find Davis's complaint regarding Dr. McLemore's deposition misplaced; whether the doctor provided the same testimony at trial as in her deposition is an inquiry outside the scope of rule 2.5(3). And as the State contends, because our record does not include the deposition, we would be unable to determine the extent of defense counsel's inquiry into Dr. McLemore's "undetermined" finding or her responses. Accordingly, we find no abuse of discretion in the district court's ruling on this issue.

**Prior-Bad-Acts Evidence.** The State presented testimony from several witnesses describing previous domestic violence inflicted on Durben by Davis. On appeal, Davis challenges only the admission of testimony about one of those instances—the Fremont County Sheriff's testimony he arrested Davis for domestic-abuse assault in June 2008 after seeing Durben with a black eye and redness on the sides of her neck. Noting this evidence was the State's only proof he had previously strangled Durben, Davis contends: "The plain purpose of the disputed testimony was to convince the fact finder [Davis] choked Durben making it likely he did the exact same thing one . . . year later."[11]

The State responds the court properly allowed proof of the prior assault because it was "highly probative to the contested issues of Davis's malice aforethought and specific intent to kill [Durben]." The State contends in this bench trial, the court was unlikely to draw an improper propensity inference. Finally, the State asserts any error was harmless because the one instance

---

[11] Davis alternatively raises this argument as an ineffective-assistance claim. Because we find counsel properly preserved error, we address Davis's evidentiary claim.

Davis challenges "was cumulative to unchallenged evidence establishing Davis's past abusive conduct."

Under Iowa Rule of Evidence 5.404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, of absence of mistake or accident.

When considering the admissibility of prior-bad-acts evidence, we apply a balancing test. First, the evidence must be "relevant to a legitimate, disputed factual issue." *State v. Putman*, 848 N.W.2d 1, 9 (Iowa 2014). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. Next, the proponent must show "clear proof" the person against whom the evidence is offered committed that act. *See Putman*, 848 N.W.2d at 8 n.2. Clear proof does not require proof of the act beyond a reasonable doubt; credible witness testimony may satisfy this requirement. *Id.* at 9.

Finally, if the first two requirements are satisfied, the court must determine if the evidence's probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* The court considers:

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Taylor*, 689 N.W.2d at 124.

The district court properly exercised its discretion in allowing the sheriff's testimony Davis physically abused Durben one year before her death. We first consider the relevance requirement. "The most obvious example of the legitimate use of prior-bad-acts evidence is the admission of evidence of a defendant's prior assaults of a victim in a prosecution of the defendant for the subsequent murder of the victim." *Id.* at 125. While this evidence may not be admitted to show a defendant's propensity to commit a crime, it is admissible to show a "defendant's motive and intent with respect to the actions giving rise to the charged crime when intent is disputed." *See id.*

Here, Davis's intent was at issue. *See Richards*, 809 N.W.2d at 95 (confirming defendant's denials "he was the perpetrator put at issue all the elements of the offense"). Davis consistently minimized the conflict between himself and Durben occurring in the hours before her death. He denied acting violently towards Durben and indicated he laughed and apologized to Durben after she "smacked" him. The prior assault was relevant to show Davis had motive and intent to kill Durben, particularly because the identity of the person who killed Durben was at issue. *See Taylor*, 689 N.W.2d at 125; *see also Richards*, 809 N.W.2d at 94.

Moreover, the State provided clear proof of the bad act in the form of credible witness testimony. The sheriff testified Durben had made a report of domestic abuse that occurred in her home. He personally saw Durben's injuries and described her as "upset, crying." The sheriff stated he obtained a warrant and arrested Davis for domestic-abuse assault. Contrary to Davis's contention, the sheriff was not required to relay what Durben specifically told him about the

origin of her injuries. *See Taylor*, 689 N.W.2d at 130 ("There simply needs to be sufficient proof to 'prevent the [fact finder] from engaging in speculation or drawing inferences based on mere suspicion.'" (quoting *State v. Brown*, 569 N.W.2d 113, 117 (Iowa 1997))).

Finding the evidence both relevant and highly probative, we next consider whether its probative value was substantially outweighed by the risk of unfair prejudice. "Clearly the likelihood of an improper use of the evidence is reduced by the fact that the present case was tried to the court." *Id.*; *see also State v. Casady*, 491 N.W.2d 782, 786 (Iowa 1992) (finding prejudicial effect of prior-bad-acts evidence "is reduced in the context of a bench trial"). Further, the State "spent a relatively small amount of time" on its line of questioning related to the 2008 assault. *See State v. Rodriquez*, 636 N.W.2d 234, 243 (Iowa 2001). And considering the medical examiner's inability to determine Durben's cause and manner of death and Davis's competing theory that Durben committed suicide, the State had a high need for the evidence. *See, e.g.*, *Taylor*, 689 N.W.2d at 129 (finding need for prior-bad-acts evidence when "defendant's intent was 'hotly contested'" and "witnesses' accounts of the event were remarkably at odds"). We find no hint in its ruling that the court improperly used the prior-act evidence in reaching its determination of guilt.

Considering all of these factors, we conclude the district court did not abuse its discretion in determining the prejudice arising from the admission of the prior-bad-act evidence did not substantially outweigh its probative value.

**C.** **Did the district court abuse its discretion in failing to grant a new trial based on the weight of the credible evidence?**

As an alternative to his sufficiency-of-the-evidence argument, Davis contends the district court should have granted him a new trial because the weight of the credible evidence heavily preponderated against the verdict. The district court may grant a new trial "[w]hen the verdict is contrary to law or evidence." Iowa R. Crim. P. 2.24(2)(b)(6). A verdict is contrary to evidence if it is against the weight of the evidence. *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). "The question for the court is not whether there was sufficient credible evidence to support the verdict rendered or an alternative verdict, but whether 'a greater amount of credible evidence' suggests the verdict rendered was a miscarriage of justice." *Ary*, 877 N.W.2d at 706 (quoting *Ellis*, 578 N.W.2d at 658–59). This determination includes assessment of witness credibility. *Ellis*, 578 N.W.2d at 658.

Davis repeats many of his arguments from his sufficiency-of-the-evidence claim, citing the lack of forensic or scientific evidence incriminating Davis and Dr. McLemore's inability to determine Durben's cause or manner of death. But Davis primarily attacks the district court's credibility findings concerning Carpenter and Stockwell, as well as and its overall assessment that Davis's behavior and demeanor on the day of Durben's death and in his interviews amounted to "contrivances." Davis claims the "contrivance" determination was not only devoid of support in the record, but it directly conflicted with credible evidence. For instance, Davis's medical records from July 18, 2009, included diagnoses of grief reaction and depression, while the State presented no medical

or other specialized testimony regarding the effects of trauma. Citing *State v. Castaneda*, Davis contends the court did not consider this evidence or that the effects of Durben's death on Davis would be "extremely difficult to accurately predict." *See* 621 N.W.2d 435, 447 (Iowa 2001) (describing admissibility of hearsay when a declarant is "psychologically unavailable" to testify).

The district court found its own verdict did not preponderate heavily against the credible evidence. We find no abuse of discretion in the district court's assessment. The court's credibility determinations concerning Carpenter and Stockwell were justified, especially considering Carpenter's friendship with Davis and Stockwell's professed fear of Davis. On the issue of Davis's veracity, we grant that some of the court's conclusions about Davis's "contrivances" may lack evidentiary support. But considering the abundance of reasonable observations the court took into account—such as the inconsistencies between Davis's statements and the other credible evidence—we find no abuse of the court's broad discretion in its bottom-line evaluation of Davis as not worthy of belief. *Cf. State v. Wilson*, 878 N.W.2d 203, 217 n.7 (Iowa 2016) ("When a defendant offers an alternate explanation for his or her evasive conduct, it is up to the jury to decide whether to credit it.").

**D.    Did Davis's trial counsel provide ineffective assistance?**

Finally, Davis argues his trial counsel was remiss for failing to properly object in three instances: (1) when the State recalled Carpenter to repeat a line of questioning that had been ruled inadmissible, (2) when Dr. McLemore testified the location of the shotgun wound was "highly unusual," and (3) when the prosecutors "improperly shifted the burden of proof" to Davis during closing

arguments. To prove ineffective assistance of counsel, Davis must show his counsel failed to perform an essential duty and this failure resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Halverson*, 857 N.W.2d 632, 635 (Iowa 2015). Davis must prove both of these elements by a preponderance of the evidence to prevail; we may affirm on appeal if either element is lacking. *See Strickland*, 466 U.S. at 687.

We ordinarily preserve ineffective-assistance claims for postconviction-relief proceedings. *See State v. Utter*, 803 N.W.2d 647, 651 (Iowa 2011). Only if we find further development of the factual record would not be of use in deciding an ineffective-assistance claim will we consider such claims on direct appeal. *See State v. Carroll*, 767 N.W.2d 638, 641 (Iowa 2009). With this framework in mind, we address Davis's three criticisms of counsel.

**Recall of Witness Carpenter.** Davis contends his trial counsel should have objected when the State recalled Carpenter during its case-in-chief. When the State initially called Carpenter to the stand, the prosecutor asked on redirect examination whether he recalled "telling DCI investigators that [Davis] . . . put you in a rear chokehold." Defense counsel objected on basis the question was outside the scope of the minutes and deposition testimony. After a bench conference, the court sustained the objection as beyond the scope of cross-examination. Following the redirect examination, the State immediately recalled Carpenter and asked him the same question. Defense counsel objected on the ground the question was leading, which the court overruled. Carpenter responded: "He was showing me a martial arts move."

Davis suggests the State did not recall Carpenter for a permissible purpose and, more specifically, argues counsel should have objected to the questioning, which "had already been ruled inadmissible." The State complains Davis is unclear about the deficiency in counsel's performance and contends counsel had no duty to object because the recall of a witness "is a matter resting largely within the trial court's discretion." *See State v. Ivy*, 300 N.W.2d 310, 311 (Iowa 1981).

We, too, find a lack of clarity in Davis's argument on appeal. He fails to specify what objection his trial counsel had a duty to make. Although, as Davis asserts, the court had previously ruled the chokehold testimony inadmissible as beyond the scope of the cross-examination, the State cured this defect by recalling Carpenter. *See, e.g.*, *id.* (upholding State recall of witnesses when "[t]he [S]tate had not yet rested; the witnesses were recalled to correct or explain testimony already given; and the defendant had unlimited opportunity to cross-examine"); *State v. Droste*, 232 N.W.2d 483, 488 (Iowa 1975) (upholding State recall of a patrolman "to establish a proper foundation for testimony relating to the breath test analysis"). Moreover, even if counsel had objected to the State's recall of Carpenter, Davis cannot show a reasonable probability that the court would have denied the State's request. *See State v. Adams*, 810 N.W.2d 365, 373 (Iowa 2012) ("To satisfy the prejudice prong, [defendant] must show 'there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.'" (citation omitted)); *see also State v. Elliott*, 806 N.W.2d 660, 674 (Iowa 2011) (emphasizing district court's "very broad discretion to permit or refuse a party from recalling a witness").

Accordingly, we find Davis has failed to demonstrate his trial counsel was ineffective in failing to object when the State recalled Carpenter.

**Dr. McClemore's Testimony.** Davis next argues his counsel should have lodged a lack-of-foundation objection to the medical examiner's opinion the left cheek was "a highly unusual place for a self-inflicted shotgun wound." He claims because the State did not demonstrate the reliability of her opinion, defense counsel would have succeeded in striking her testimony. According to Davis, the State has a weak case against him, and without the objectionable testimony, which "gave a statistical likelihood [Durben's] death was a homicide," a reasonable probability existed the result of his trial would have been different. The State contends the record on direct appeal is insufficient to resolve Davis's ineffective-assistance claim. The State urges defense counsel may have had reasonable strategic grounds for failing to object to Dr. McLemore's testimony on foundational grounds and, had his counsel objected, Dr. McLemore may have been able to support her testimony and overcome the objection.

We agree our record is not sufficient to resolve Davis's claim. *See State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978) (finding because defense counsel may "have had good reason for each step he took or failed to take," issue of ineffective counsel should be preserved for postconviction-relief proceedings, "where a full evidentiary hearing may be had and where counsel will have an opportunity to respond to defendant's charges."). It is unclear whether Dr. McLemore could have provided the requisite foundation for her statement. *See, e.g.*, *State v. Tyler*, 867 N.W.2d 136, 163 (Iowa 2015) (finding medical examiner's opinions on cause and manner of death inadmissible when "based

primarily, if not exclusively, on [defendant's] inconsistent and uncorroborated statements to police, as opposed to objective medical findings"); *State v. Newman*, No. 13-1640, 2015 WL 5278914, at *23–24 (Iowa Ct. App. Sept. 10, 2015) (finding anecdotal accounts from police officers implying it was rare for women to commit suicide with a firearm were erroneously admitted into evidence). Considering the incomplete record and the possibility of prejudice,[12] we preserve this claim for postconviction-relief proceedings.

**Prosecutors' Remarks During Closing Arguments.** As his last assignment of error, Davis rebukes counsel for not objecting when prosecutors commented during closing arguments that the defense did not present evidence Durben had attempted suicide in the past. Davis cites two passages from the State's closing arguments. First, one prosecutor stated: "The defense never presented any history of suicide of [Durben]. They never said there [were] attempts of [Durben] to kill herself." Then, on rebuttal, another prosecutor elaborated:

> You see Holly Durben wanted to live that night. She did not want to die. And what was not presented in this case and no evidence from the defense was any suicide attempt historically by Holly Durben. There is no history that she had ever ideated suicide in such a fashion that she acted on it. She had never taken any overdose of pills. She had never had a gun to her head before. She had never attempted to cut her wrists. [S]he had never been under a 229 commitment. She had never been admitted to Glendale. She had never been at the psych unit at any hospital, such as Shenandoah Memorial Hospital.

---

[12] At oral argument, the State identified Dr. McLemore's testimony regarding the undetermined cause and manner of Durben's death, which includes the statement at issue here, as the strongest evidence of Davis's guilt presented at trial. Moreover, the district court relied upon her expert testimony in its verdict: "The medical examiner, a trained forensic pathologist, characterized the location of the gunshot wound as highly unusual for a self-inflicted shotgun wound."

In its verdict, the district court found: "No evidence was presented that Durben had ever attempted suicide or that she had been treated for depression."

Davis argues the prosecutors' statements "effectively shifted its burden to [Davis] to disprove Durben did not cause her own death." The State responds that even if the statements constituted prosecutorial error, Davis cannot show prejudice. The State contends that because Davis had a bench trial, there was little danger the comments influenced the fact finder.

The prosecutors' statements did not constitute misconduct or error in these circumstances. A prosecutor may not draw attention to the defendant's decision not to testify, *see State v. Bishop*, 387 N.W.2d 554, 563 (Iowa 1986), and may not attempt to shift the burden of proof to the defense, *see State v. Hanes*, 790 N.W.2d 545, 557 (Iowa 2010). Here, the prosecutors did not call attention to Davis's failure to testify, nor did they assert Davis had the burden to put on evidence. Instead, the prosecutors highlighted the lack of evidence supporting Davis's theory of the case—that Durben committed suicide. *See, e.g.*, *Hanes*, 790 N.W.2d at 557 (suggesting it is not improper for a prosecutor to "generally reference[] an absence of evidence supporting the defense's theory of the case"); *State v. Swartz*, 601 N.W.2d 348, 353 (Iowa 1999) (finding no error in prosecutor's statement in rebuttal "that absolutely no evidence of any kind had been presented that defendant did hold a good-faith belief that he could possess a firearm"); *State v. Davisson*, No. 15-1893, 2016 WL 7393890, at *3 (Iowa Ct. App. Dec. 21, 2016) (finding no improper burden shifting resulted from prosecutor's statement: "Defense counsel also has an opportunity, if they bring

forth an idea like mistake of fact, to bring people in, to subpoena people . . . . It's kind of hard to subpoena someone who doesn't really exist."). And as the State argues, the district court's verdict, which stated: "The State has the burden to prove each element of the charged offense beyond a reasonable doubt," made it clear the court understood the State bore the burden of proof. Accordingly, because the prosecutors' statements neither shifted the burden of proof onto Davis nor referenced his decision not to testify, we find counsel had no duty to object.

**AFFIRMED.**