STATE of Iowa, Appellee,

v.

Ryan Patrick QUINN, Appellant.

No. 03–1643.

Supreme Court of Iowa.

Jan. 7, 2005.

Rehearing Denied Feb. 4, 2005.

J.E. Tobey III, Davenport, for appellant.

Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, William E. Davis, County Attorney, and Alan R. Havercamp, Julie A. Walton, and Marc Gellerman, Assistant County Attorneys, for appellee.

LAVORATO, Chief Justice.

The defendant, Ryan Patrick Quinn, appeals from a judgment of conviction and sentence in a bench trial for attempting to entice away a minor in violation of Iowa Code section 710.10(3) (2003). He contends, among other things, that there was insufficient evidence to support his conviction. He also contends that the inference permitted in Iowa Code section 710.10(4) violates free speech as guaranteed by the First Amendment. We conclude there was sufficient evidence to support his conviction. However, because the district court, in reaching its verdict, applied a statutory inference that is unconstitutional, we must reverse the judgment of conviction and sentence and remand the case for further proceedings.

## I. Background Facts.

Sometime late in the afternoon of April 22, 2003, Karis Agnew, an eight-year-old second-grader, was riding her bike on the sidewalk across from her house. Karis lived in a residential neighborhood with her mother and father. Her father, Ron Agnew, gave Karis permission to ride her bike that day while he was working on his motorcycle in his garage. He had the

garage door open so he could keep an eye on Karis.

Shortly after Karis began riding her bike, she saw a brown car with a dark brown stripe drive by. The driver said "hi" to her. The driver turned the car around and then pulled into a driveway, blocking Karis's path on the sidewalk. The driver spoke to Karis through his open window, but did not open the car door. He said to her, "come over here" and gestured with his index finger to come over. Karis thought the driver indicated that he wanted her to "come over in the car—into the car, go into the car." The driver did not offer anything to Karis. Karis then screamed, "Dad."

Ron heard the scream, and father and daughter ran to each other. Ron saw a brown hatchback pull out of the driveway and drive away. Karis "was in hysterics, screaming and crying." She tried to tell her father what had happened, but he could not understand her because she was crying so much and was scared.

Helen, Karis's mother and Ron's wife, arrived home shortly after the incident at which point Ron called the police. Police Chief David Kopatich of the city of Walcott arrived on the scene within minutes of the call. Ron and Karis described what had happened.

At the request of Chief Kopatich, Police Officer Kevin Takacs also responded to Ron's call; Officer Takacs searched the area, looking for a car that matched the Agnews' description but did not find it in the area. Approximately forty-five minutes after the incident, the police had a suspect—Ryan Patrick Quinn. Officer Takacs went to Quinn's home in Davenport and waited for him. Quinn arrived about thirty minutes later. Officer Takacs spoke with Quinn and then contacted Chief Kopatich, who came to Quinn's residence. Chief Kopatich photographed Quinn's vehi-cle, which matched the Agnews' descrip-tion.

Quinn told the officers that he had been in Walcott earlier, he turned around in a residential neighborhood, and said "hi" to a little girl. Quinn agreed to speak with the officers at the Walcott police depart-ment where Chief Kopatich took photo-graphs of him.

At the police department, Quinn de-scribed his activities for the day. He went to a dental appointment and played golf in Iowa City. On his way home, he stopped in Durant for cigarettes. As he was driv-ing, he threw a cigarette out the window, feared it blew into the backseat, so he stopped in Walcott to check on it. He said "hi" to a little girl, backed out of a drive-way, and left the area. He heard a girl scream, but did not know what was going on.

Chief Kopatich told Quinn he did not believe the story at which point Quinn became defiant, insisting that he had told the truth. Chief Kopatich then had Quinn put in writing what he had just told the officer. After he signed the written state-ment, Quinn signed a *Miranda* rights waiver. Following that, Chief Kopatich left Quinn with Officer Takacs and an offi-cer from the Durant police department.

The latter three again discussed what had happened. At trial, Officer Takacs testified that after Chief Kopatich left the room, he and Quinn had more conversa-tion. He further testified that Quinn said the little girl was smiling and looked to be having a good time, that as soon as he made eye contact, she became scared, and "the look on her face was like she could read my mind like she knew what I wanted to do to her later."

According to Officer Takacs, the conver-sation continued during which Quinn said he would go out, drive around at random,

and make some kind of eye contact with a female and such contact was enough stimulation for him to go home, take a nice hot shower, and masturbate. Officer Takacs further testified that Quinn said he usually preferred girls fourteen and sixteen years of age because girls his age made fun of him and that he had had only two sex partners in his life.

At Chief Kopatich's request, Quinn signed a second written statement. In this statement, Quinn stated that he would never try to pick up a girl, never has, and never wanted to. He craves only eye contact from girls; he thinks about the eye contact when he takes a shower and masturbates.

The next day Ron identified Quinn's car from photographs taken by the police. Karis identified both Quinn's car and Quinn from the photographs. At trial, Ron testified that he did not know Quinn, and Quinn did not have permission to talk to his daughter.

## II. Proceedings.

The State charged Quinn with attempting to entice away a minor under sixteen years of age, an aggravated misdemeanor, in violation of Iowa Code section 710.10(3). Later, Quinn filed a motion for a bill of particulars and a motion to dismiss, contending that the minutes of testimony lacked evidence to support the statutory requirement that he was attempting to entice away or attempting to commit an illegal act upon a minor. The district court denied the motions.

Shortly before trial, Quinn filed a motion for adjudication of law points and objection to application of evidentiary instruction. In the motion, Quinn contended that the inference permitted by Iowa Code section 710.10(4) (providing that an intent to commit a violation of section 710.10 "may be inferred when the person is not

known to the person being enticed away and the person does not have the permission of the parent, guardian, or custodian to contact the person being enticed away") violated his constitutional rights. More specifically, Quinn alleged that the language of section 710.10(4) violated his "rights as incorporated under due process within the context of the First Amendment to the United States Constitution, to-wit: Freedom of Speech and Assembly." He also contended that the language of section 710.10(4) was overbroad on its face and as applied because the inference establishes all elements of the offense charged.

The court indicated that it would rule on the motion in its written ruling following the bench trial. Before this, Quinn had waived his right to trial by jury. Quinn also renewed his motion for bill of particulars and motion to dismiss, motions the court noted had been previously denied.

At trial, the court heard testimony from Ron, Karis, Chief Kopatich, and Officer Takacs. At the end of the State's case, Quinn moved for judgment of acquittal and renewed his motion for bill of particulars and motion to dismiss. The court denied the motions. Quinn rested without presenting any evidence.

Later, the district court issued its findings of fact and conclusions of law, finding Quinn guilty as charged. In its ruling, the court concluded:

> The defendant has objected to the application of [Iowa Code section 710.10(4)] on the basis that it violates the due process clause of the constitution because it permits a finding of guilt without the facts to support such a finding.
>
> The Court disagrees with the defendant's argument in this regard, so long as the inference is limited to defendant's

specific intent to commit the crime. What a person intends is seldom capable of direct proof. Therefore, an inference of specific intent would be appropriate after considering all the facts and circumstances surrounding the incident.

The court then made this significant finding:

> The deciding factor in this case is the uncontroverted statement given to Officer Kevin Takacs by the defendant describing the victim's smiling face that quickly changed as if she knew what he wanted to do to her later. To the Court in this case it can be inferred that he had in mind taking her in furtherance of his sexual attraction to young girls.

Following this ruling, Quinn filed a motion for new trial on several grounds, one of which is most significant here: The verdict is contrary to law or evidence. *See* Iowa R.Crim. P. 2.24(2)(*b*)(6). Among other things, Quinn argued in his motion that the inference the court used was improper and the court failed to properly address his constitutional arguments. The court denied the motion, stating, among other things, that it did not agree with the constitutional arguments made. Later, the court sentenced Quinn following which Quinn appealed.

## III. Issues.

Among the issues Quinn raises, we consider two: (1) Was the evidence sufficient to sustain the guilty verdict? (2) Does the provision for inference of guilt in Iowa Code section 710.10(4) impermissibly infringe upon Quinn's First Amendment rights?

## IV. Scope of Review.

 We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Corsi*, 686 N.W.2d 215, 218 (Iowa 2004). We uphold a verdict if sub-

stantial evidence supports it. *State v. Biddle*, 652 N.W.2d 191, 197 (Iowa 2002). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *Id.* Substantial evidence must do more than raise suspicion or speculation. *Corsi*, 686 N.W.2d at 218. We consider all record evidence not just the evidence supporting guilt when we make sufficiency-of-the-evidence determinations. *Id.* However, in making such determinations, we also view the "evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Biddle*, 652 N.W.2d at 197.

 We review constitutional claims de novo. *Id.* at 200. In our review, we are guided by the following well-known principles:

> Because statutes are cloaked with a strong presumption of constitutionality, a party challenging a statute as unconstitutional carries a heavy burden of rebutting this presumption. Such a party must negate every reasonable basis upon which the court could hold the statute constitutional. Such a party must also show beyond a reasonable doubt that a statute violates the constitution.

*Id.* (citations omitted).

## V. Sufficiency of the Evidence.

The statute under which Quinn was convicted provides:

> A person commits an aggravated misdemeanor when, without authority and with the intent to commit an illegal act upon a minor under the age of sixteen, the person attempts to entice away a minor under the age of sixteen, or attempts to entice away a person reason-

ably believed to be under the age of sixteen.

Iowa Code § 710.10(3). So to convict Quinn, the State had to prove beyond a reasonable doubt that Quinn (1) acted without authority, (2) acted with the intent to commit an illegal act upon a minor under the age of sixteen, and (3) attempted to entice away a minor under the age of sixteen or attempted to entice away a person reasonably believed to be under the age of sixteen.

At trial, Quinn moved for judgment of acquittal on the grounds that the State had failed to prove that he committed an act of enticement or had the specific intent to commit an illegal act upon Karis. The district court denied the motion and found there was sufficient evidence to convict. On appeal, Quinn again challenges the State's proof on these elements. Quinn does not claim he had authority to do what he did. Nor does he raise any question about the age requirement in the statute. So we do not address these elements.

We had occasion to define "entice" as used in section 710.10(3) in *State v. Osmundson*, 546 N.W.2d 907 (Iowa 1996) (case defined "entice" as used in Iowa Code section 710.10(2) (1993) which said, "A person commits an aggravated misdemeanor when, without authority and with the intent to commit an illegal act upon the child, the person attempts to entice away a child."). In that case we defined "entice" as " 'to draw on by arousing hope or desire' or 'to draw into evil ways,' " or

> "[t]o wrongfully solicit, persuade, procure, allure, attract, draw by blandishment, coax or seduce. To lure, induce, tempt, incite, or persuade a person to do a thing. Enticement of a child is inviting, persuading or attempting to persuade a child to enter any vehicle, building, room or secluded place with intent

to commit an unlawful sexual act upon or with the person of said child."

*Osmundson*, 546 N.W.2d at 909 (alteration in original) (citations omitted). Considering all of the record evidence and viewing the evidence in the light most favorable to the State, we conclude there was substantial evidence to support the district court's finding that Quinn was attempting to entice away Karis for the purpose of performing an illegal act upon her.

Karis testified that Quinn blocked her path, said "come over here," and gestured with his finger for her to come to him. Quinn does not deny he was in the area, said "hi" to Karis, and heard her scream. Moreover, according to Officer Takacs' testimony, Quinn said that Karis was smiling and looked to be having a good time, that as soon as he made eye contact with her, she became scared and "the look on her face was like she could read my mind like she knew what I wanted to do to her later."

A fact finder could reasonably infer from all of this evidence that Quinn was attempting to entice away Karis for the purpose of performing an illegal act upon her. As the district court found here, a fact finder could reasonably infer that the intent to commit an illegal act on Karis could have been false imprisonment. Or given Quinn's admitted sexual gratification from making eye contact with young girls, the illegal act could have been much worse, such as sexual abuse. We agree with the State that as a fact finder the district court was free to reject Quinn's denial of an intent to do nothing more than make eye contact.

## VI. The Constitutional Issue.

Iowa Code section 710.10 is captioned "Enticing away a minor." This section describes various offenses concerning enticement of minors or attempts to entice

minors for the purpose of committing an illegal act upon them. Section 710.10(3), the one under which Quinn was convicted, is one of those provisions. Iowa Code section 710.10(4) permits an inference relative to all of these provisions. Specifically, section 710.10(4) provides:

> A person's intent to commit a violation of this *section* may be inferred when the person is not known to the person being enticed away and the person does not have the permission of the parent, guardian, or custodian to *contact* the person being enticed away.

Iowa Code § 710.10(4) (emphasis added).

In pretrial motions, Quinn challenged section 710.10(4) on the grounds that this provision

> permits a fact finder to infer an intent to commit the whole of the criminal offense merely from the conduct of speaking to a person 16 years of age or younger who is not known to the speaker and under circumstances where the speaker has not been given permission of an appropriate person to speak to that particular minor person.

Relying on *Virginia v. Black,* 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), Quinn contended that the application of the evidentiary inference in section 710.10(4)

> violates the defendant's rights as incorporated under due process within the context of the First Amendment to the United States Constitution, to-wit: Freedom of Speech and Assembly.... [T]he language of [section 710.10(4)] is overbroad on its face and as applied in this context and thus, the application of this evidentiary rule in connection with a charge of attempting to entice away a minor cannot be done without violating the above stated constitutional protections.

Quinn made this same challenge at trial, and the district court rejected it, stating:

> The Court disagrees with the defendant's argument in this regard, so long as the inference is limited to defendant's specific intent to commit the crime. What a person intends is seldom capable of direct proof. Therefore, an inference of specific intent would be appropriate after considering all the facts and circumstances surrounding the incident.

In its decision, the district court, apparently applying the section 710.10(4) inference, found that "the defendant was not known to Karis Agnew nor did her parents give permission to the defendant to contact her."

On appeal, Quinn again raises the First Amendment challenge and again relies heavily on *Black.* Simply put, he contends the inference permitted by section 710.10(4) violates his freedom of speech and is overbroad on its face and as applied. He maintains that a person can be convicted of violating Iowa Code section 710.10(3) merely by having contact with someone in the protected class described in section 710.10(4). Not surprisingly, the State counters that the district court correctly applied section 710.10(4) in conjunction with section 710.10(3) when the court rejected Quinn's constitutional challenge.

The First Amendment to the Federal Constitution prohibits Congress from making laws "abridging the freedom of speech." U.S. Const. amend. I. The Due Process Clause of the Fourteenth Amendment to the Federal Constitution makes the First Amendment applicable to the states. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217–18 (1940).

In *State v. Milner,* we summarized the principles a court applies when considering a First Amendment challenge to a statute:

The First Amendment's guarantee of freedom of speech prevents states from punishing "the use of words or language not within 'narrowly limited classes of speech.'" Consequently, a statute must be narrowly drawn or authoritatively construed so as "to punish only unprotected speech and not be susceptible of application to protected expression." A statute violates the First Amendment and is unconstitutionally overbroad if (1) it substantially proscribes protected speech "judged in relation to the statute's plainly legitimate sweep," and (2) the court cannot narrow the statute to cover only nonprotected speech. When a statute purports to regulate speech, even one to whom the statute may constitutionally be applied is permitted to urge the statute is facially overbroad.

571 N.W.2d 7, 13 (Iowa 1997) (citations omitted).

In *Black*, the United States Supreme Court was faced with a free speech and overbreadth challenge to a cross-burning statute. The statute at issue provided:

"It shall be unlawful for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place. Any person who shall violate any provision of this section shall be guilty of a Class 6 felony.

Any such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons."

*Black*, 538 U.S. at 348, 123 S.Ct. at 1541–42, 155 L.Ed.2d at 545 (quoting Va.Code Ann. § 18.2–423 (Michie 1996)). The trial court gave the jury the following instruction: "'[T]he burning of a cross, by itself, is sufficient evidence from which you may infer the required intent.'" *Id.* at 349, 123 S.Ct. at 1542, 155 L.Ed.2d at 546 (citation omitted).

The Court upheld the portion of the statute banning cross burnings with the intent to intimidate. *Id.* at 362–63, 123 S.Ct. at 1549–50, 155 L.Ed.2d at 554. However, with respect to the prima facie intent portion of the statute, in a plurality opinion, Justice O'Connor, joined by Chief Justice Rehnquist and Justices Steven and Breyer, concluded that portion was facially unconstitutional because it permitted the state to convict a person based solely on the fact that a cross was burned. *Id.* at 365–67, 123 S.Ct. at 1550–52, 155 L.Ed.2d at 556–57. On this point, the plurality opinion said:

[T]he prima facie provision strips away the very reason why a State may ban cross burning with the intent to intimidate. The prima facie evidence provision permits a jury to convict in every cross-burning case in which defendants exercise their constitutional right not to put on a defense. And even where a defendant like Black presents a defense, the prima facie evidence provision makes it more likely that the jury will find an intent to intimidate regardless of the particular facts of the case. The provision permits the Commonwealth to arrest, prosecute, and convict a person based solely on the fact of cross burning itself.

It is apparent that the provision as so interpreted "'would create an unacceptable risk of the suppression of ideas.'" The act of burning a cross may mean that a person is engaging in constitutionally proscribable intimidation. But that same act may mean only that the person is engaged in core political speech. The prima facie evidence provision in this statute blurs the line between these two meanings of a burning cross. As interpreted by the jury instruction, the provision chills constitutionally protected political speech because of the possibility

that the Commonwealth will prosecute—and potentially convict—somebody engaging only in lawful political speech at the core of what the First Amendment is designed to protect.

As the history of cross burning indicates, a burning cross is not always intended to intimidate. Rather, sometimes the cross burning is a statement of ideology, a symbol of group solidarity. It is a ritual used at Klan gatherings, and it is used to represent the Klan itself. Thus, "[b]urning a cross at a political rally would almost certainly be protected expression. . . .

The prima facie provision makes no effort to distinguish among these different types of cross burnings.

*Id.* at 365–66, 123 S.Ct. at 1550–51, 155 L.Ed.2d at 555–56 (citations omitted).

▅▅▅ Here, section 710.10(4) permits a fact finder to infer a person's intent to commit a violation of section 710.10(3) if the person (1) is not known to the minor being enticed away and (2) the person does not have the permission of the minor's parent, guardian, or custodian to contact the minor being enticed away. The plain language of section 710.10(4) therefore permits an inference that *all* elements of section 710.10(3) are established merely by the "contact." "Contact," when used as a verb, means "to communicate with." *Webster's Encyclopedic Unabridged Dictionary* 437 (1996). Simply put then, a person who speaks to a minor described in section 710.10(3) may be arrested, prosecuted, and convicted for violating section 710.10(3) merely upon proof of the act of speaking with such minor, which without more, is protected under the First Amendment. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 503–04, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502, 518 (1984) ("The First Amendment presupposes that the freedom to speak

one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the ·common quest for truth and the vitality of society as a whole."); *Martin v. City of Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313, 1316 (1943) ("The right of freedom of speech and press has broad scope."). Whether section 710.10(3) is violated is inextricably intertwined with the proscribed contact in section 710.10(4).

Moreover, the inference here tends to shift the burden of proof to the defendant and penalizes a defendant who, as here, does not testify. The tendency in these circumstances is for the fact finder to convict unless the defendant has an explanation as to why he spoke to the minor. This is exactly the fear the plurality expressed in *Black. See Black,* 538 U.S. at 365, 123 S.Ct. at 1550–51, 155 L.Ed.2d at 555.

We reject the State's argument that the inference in section 710.10(4) is limited to the intent to commit an illegal act upon a minor in section 710.10(3). The State's argument overlooks the legislature's change in the inference. In 2001, the inference provision was found in Iowa Code section 710.10(3) and provided:

·A person's intent to commit an illegal act upon the child may be inferred when the· individual is not known to the child and the individual does not have the permission of the child's parent, guardian, or custodian to contact the child.

Iowa Code § 710.10(3) (2001).

If the inference in section 710.10(4) (2003) is limited to the intent to commit an illegal act upon a minor in section 710.10(3) as the State argues, there would have been no need to change the statute. There is a considerable ·difference between the language "[a] person's intent to commit an illegal act upon the child may be inferred" in the previous statute (Iowa Code section

710.10(3) (2001)) and the language "[a] person's intent to commit a violation of this section may be inferred" in the present statute (Iowa Code section 710.10(4) (2003)).

Moreover, "enticement" in section 710.10(3) has an element of intent. *See* Iowa Code § 710.10(3). Therefore, contrary to the State's position, the inference in section 710.10(4) is not limited to the intent to commit an illegal act upon a minor.

We conclude section 710.10(4) is overbroad because it substantially proscribes protected speech and the statute cannot be narrowed to cover only nonprotected speech. The statute is not only facially unconstitutional, it is unconstitutional as applied to Quinn.

## VII. Disposition.

In sum, we conclude there was substantial evidence to support the conviction. However, because the district court in reaching its verdict applied an inference pursuant to a provision that is facially unconstitutional and as applied, we must reverse the judgment of conviction and sentence. The remedy here is to remand the case to allow the district court to make new findings and conclusions of law based on the record before it without resorting to the inference in Iowa Code section 710.10(4).

**REVERSED AND CASE REMANDED WITH DIRECTIONS.**

All justices concur except CADY and LARSON, JJ., who dissent.

CADY, Justice (dissenting in part).

I respectfully dissent. The statute under examination in this case can easily be interpreted to be consistent with the constitution, and we are obligated to declare the statute constitutional. *See, e.g., Pfister v. Iowa Dist. Ct. for Polk County,* 688 N.W.2d 790, 794 (Iowa 2004) ("When the constitutionality of a statute is challenged, 'we presume the statute is constitutional and "give it any reasonable construction necessary to uphold it."'" (quoting *State v. Anspach,* 627 N.W.2d 227, 231 (Iowa 2001)); *In re Adoption of S.J.D.,* 641 N.W.2d 794, 797 (Iowa 2002) ("If a statute is susceptible to more than one construction, one of which is constitutional and the other not, we are obliged to adopt the construction which will uphold it." (citing *Santi v. Santi,* 633 N.W.2d 312, 316 (Iowa 2001)).

If we restrict the meaning of "intent" under the statutory inference in section 710.10(4) to apply only to the "intent to commit an illegal act" element of the crime under section 710.10(3), section 710.10(4) is not unconstitutional. It is not unconstitutional because the inference does not establish all the elements of the crime. The state must still establish that the person made an attempt to entice away the minor. *See* Iowa Code § 710.10(3). Thus, the inference, unlike the inference in *Black,* does not permit the state to convict a person based solely upon engaging in protected speech.

The majority rejects this approach by interpreting "intent" under section 710.10(4) to apply not only to the "intent to commit an illegal act" element but also to the "attempt to entice" element. It points out that enticement necessarily considers a person's state of mind. That may be true, but it does not transform an "attempt" element into an "intent" element. An attempt also requires some act. The statute does not permit a conviction based solely on a person's intent.

The majority ultimately relies on the legislative amendment to the statute to reject any interpretation that limits the

inference to the "intent to commit an illegal act" element. It concludes it is not possible to restrict the "intent" aspect of the statutory inference to the "intent to commit an illegal act" element of the crime because there otherwise would have been no reason for the legislature to amend the statute in 2001. However, the majority overlooks a very logical reason for the amendment that would render the statute constitutional.

The legislature amended the statute in 2001 by changing "intent to commit an illegal act" to "intent to commit a violation of this section." What the majority overlooks is that the crime of enticing a child was also expanded by the legislature to provide three means to commit the crime, now defined in the first three subsections of section 710.10. Subsection (4) of section 710.10 then, of course, sets forth the inference. Although subsections (2) and (3) of section 710.10 utilize the "intent to commit an illegal act" element (the exact language contained in the statutory inference prior to the 2001 amendment), subsection (1) utilizes an "intent to commit sexual abuse or sexual exploitation" element. Thus, the statutory inference was changed by the legislature to "intent to commit a violation of this section" so as to make the inference applicable to all three sections of 710.10. Contrary to the conclusion of the majority, the legislature had a rational and valid reason to amend the statute, and we are obligated to give the legislature the benefit of this reasoning.

For these reasons, I respectfully dissent to that portion of the opinion of the majority that declares the statute to be unconstitutional.

LARSON, J., joins this dissent.