# IN THE COURT OF APPEALS OF IOWA

No. 18-1549
Filed February 5, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**TREMAYNE THOMAS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Nancy S. Tabor, Judge.

        Tremayne Thomas appeals his convictions for first-degree murder and abuse of a corpse. **AFFIRMED.**

        Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee.

        Heard by Bower, C.J., and Greer and Ahlers, JJ. Tabor, J., takes no part.

**BOWER, Chief Judge.**

Tremayne Thomas was convicted of first-degree murder and abuse of a corpse. On appeal, his counsel argues there was insufficient evidence to prove he committed murder.[1] While circumstantial, the evidence is sufficiently compelling to convince the jury of Thomas's guilt. We therefore affirm.

**I. Background Facts and Proceedings.**

Around 4:00 a.m. on May 30, 2017, Nicole Long awakened and saw a fire about fifty feet down the block. Long filled a milk jug with water, grabbed a fire extinguisher, and headed toward the fire. When she arrived, she found two fires— one on the sidewalk and the other on the grass near the street. Long unsuccessfully attempted to douse the first fire with water, then used the fire extinguisher. When she started to use the extinguisher on the second fire she realized it was a body. Kimberly Pizano, a paper delivery person, was in a car nearby. Long yelled to Pizano to call 911 while she continued to extinguish the flames.

---

[1] Thomas has filed a pro se supplemental brief also challenging the sufficiency of the evidence. We consider Thomas's pro se brief as part of his appeal because this matter was already pending when Iowa Code section 814.6A took effect on July 1, 2019. *See State v. Macke*, 933 N.W.2d 226, 236 (Iowa 2019) (concluding the amendments to Iowa Code section 814.6 and 814.7 apply only prospectively— to appeals filed after the law took effect on July 1); *State v. Syperda*, No. 18-1471 2019 WL 6893791, at *12 (Iowa Ct. App. Dec. 18, 2019) ("Because we see no suggestion in *Macke* that the supreme court would treat section 814.6A(1) differently from the other amendments in S.F. 589, we conclude we may consider [the defendant's] pro se brief filed before the effective date of the legislation."); *State v. Purk*, No. 18-0208, 2019 WL 5790875, at *7 n.8 (Iowa Ct. App. Nov. 6, 2019) (applying the reasoning of *Macke* and concluding section 814.6A "does not apply to this appeal, which was filed prior to July 1, 2019"). Because we will consider Thomas's pro se filing, we need not address his claim that the amended legislation violates the separation-of-powers doctrine.

Police officers responded to the 4:29 a.m. dispatch sent out as a result of Pizano's 911 call. When they arrived in front of 3010 Denison, Davenport, they found the severely burned body of a man later identified as Brandon Brooks. Near the body was another burned area with a coiled spring like that in the nozzle of a gas can. An autopsy determined Brooks—who was approximately five feet, two inches tall—died of the combined effects of a contact gunshot wound to the left arm and multiple blunt force injuries to his head, back, ribs, and stomach. His neck also bore ligature marks. Brooks was wearing Walls brand coveralls. A toxicology screen found no alcohol or drugs in Brooks's system.

An ensuing investigation led to the arrest of Tremayne Thomas, who was charged with first-degree murder and abuse of a corpse. From the evidence presented at trial viewed in the light most favorable to the State, the jury could have found the following:

At about 5:00 p.m. on May 26, Brooks went to Wal-Mart where he purchased a cellphone, which he paid for with two $100 dollar bills. Surveillance video shows Brooks took the money from a larger bundle of cash from his pocket.

On May 29,[2] Brooks, Alice Whitfield, and her child went to Thomas's apartment at 3536 Heatherton Drive. While Whitfield and the child stayed in their vehicle, Brooks got into a vehicle with Thomas and talked for thirty to forty-five minutes. After leaving Thomas's apartment, Brooks had Whitfield drive him to Wal-Mart, where he purchased a bicycle and other items. The purchase was made at 1:22 p.m. Surveillance video shows Brooks wearing dark clothing and a baseball

---

[2] May 29, 2017, was Memorial Day.

cap. Brooks removed several bills from his pockets and paid for the bicycle and other items with cash. Brooks rode the bicycle out of the store, gave a bag containing his other items to Whitfield, and rode away on the bicycle.

Sometime during the evening of May 29, Thomas called Robert Graham and asked him to "give his friend a ride."[3] Graham went to Mother Hubbard's Cupboard gas station and convenience store at 3636 Hickory Grove and picked up a short man wearing a black baseball cap and dark clothes. The man asked to use Graham's phone, made a call, and then Graham dropped the man off at 29th and Heatherton. The gas station is north and slightly west of the Heatherton Apartment complex where Thomas resided.

According to available cell-tower information, from 11:03 p.m. on May 29 to 12:17 a.m. on May 30, Brooks's cellphone was within a geographic area that included Thomas's apartment. No further activity occurred on Brooks's phone after 12:17 a.m., and the phone was never found.

At 12:28 a.m. on May 30, the Mother Hubbard's Cupboard surveillance video shows Thomas, Michael Jackson, and Gervonte Williams get out of a green Dodge Caravan and enter the convenience store. Thomas appears to be wearing dark pants and a two-toned lighter jacket. When the three men left the store, Thomas got in the rear seat of the van, Williams got in the front passenger seat, and Jackson got in the driver's seat.

---

[3] Graham did not know the time but said, "It was getting dark out. It was barely light because I had my headlights on." Graham testified Thomas paid him "a few dollars" for driving.

At 3:45 a.m., video surveillance in and outside of 3240 Heatherton Drive shows Thomas drive up in a green Dodge Caravan, exit the van, enter an apartment using a key, and leave about two minutes later carrying a gas can. Thomas was dressed in different clothing than shown on the Mother Hubbard's Cupboard surveillance video—he now had on a larger beige coat and what appears to be baggier pants. Thomas got into the driver's seat of the Caravan and drove away. No one else was visible in the van.

At 4:12 a.m., a citizen's surveillance system at 3226 Denison captured video of a full-sized dark pickup truck with a topper driving by and headed away from where Brooks's body was found.

On May 31, Detective Bryon Grothus was one of several officers involved in conducting surveillance of Thomas's 3536 Heatherton apartment on an unrelated matter. Detective Grothus saw Thomas exit his building, get into a white truck, and get let off at 3374 Heatherton, where police knew Thomas's girlfriend lived. While watching 3374 Heatherton, Detective Grothus saw a man on the back deck smoking a cigarette. That man later got into a green Dodge Caravan and drove away. The man returned in the van, and Detective Grothus approached the van on foot and asked the man to stop to talk. However, the man drove away. Detective Grothus was able to identify the driver of the van as Williams.

Police knocked on Thomas's girlfriend's apartment door but got no response for quite some time. Eventually, Thomas exited the apartment and was taken into custody.

Police learned Thomas was employed at the Heatherton Apartment complex doing outside landscape work. He had access to several of the

apartments, including 3240 Heatherton, Apartment 2, which was used as a supply closet for all the maintenance work. A video surveillance system was housed in that apartment.

Another maintenance worker for the apartment complex, Randy Libby, told police there was no standard clothing requirement but they would wear coverall type pants. Libby stated Thomas had at one point given him a pair of black Carhartt-type pants. He also showed police a pair of Wall coveralls. Libby was able to determine a gas can was missing from the room.

Sheldon Aviles managed the apartments at Heatherton Drive and worked with Thomas doing landscaping. Aviles testified that at some point Thomas gave him a pair of brown/tannish Walls coveralls.

On the evening of May 31, police officers questioned Thomas after advising him of his *Miranda* rights. Thomas acknowledged he knew Brooks and that he had offered to allow Brooks to stay at his apartment on May 29. Thomas repeatedly stated he had nothing to do with Brooks's death or setting the body on fire. He described Brooks as argumentative, having problems with others, and as having a "mouth on him." He said he had not seen Brooks that night because Thomas spent the evening with his girlfriend, his uncle, and his aunt. He claimed he spent the entire night with his girlfriend at her apartment (3374 Heatherton). Thomas also told the officers he hardly ever stayed at his own apartment, using it only when his children came to visit because their mother did not like his girlfriend.

Thomas's apartment was searched. A cleaning-product container was found with blood on it. Blood spatters were also found on a number of walls and the floor. The bathroom had a number of visible blood spatters. One officer

testified that when the bathroom was sprayed with luminol—an agent used to indicate the presence of blood—"[t]he sink, the floor, the wall above the toilet, and then the other wall" all lit up. "[Y]ou could see like it was smeared, how I would describe it." Testing indicated the blood throughout the apartment belonged to Brooks.

On June 2, a green Dodge Ram 1500 pickup with a topper was located by police in an alley behind 1636 West Third Street, which is where Williams stayed. Police had earlier had contact with Thomas at that address on an unrelated call. It was determined the pickup belonged to Thomas. The truck had a strong smell of cleaning agents and police found a bucket of cleaning supplies in the back seat. In addition to the cleaning supplies, a lighter, and a round of .22 caliber ammunition were also found in the truck. Three blood samples taken from the bed of the truck resulted in a DNA profile consistent with Brooks's DNA profile.

On June 3, police located the green Caravan parked on the street on the 1500 block of West Third. The van was registered to a woman with an address of 1636 West Third Street. Brooks's blood was found on the hatchback of the Dodge Caravan. There was a hammer under the driver's seat. There was a bat in the back, but suspected areas of blood were not confirmed. The bat and a red gas can were found under some children's backpacks and clothing in the rear of the van.

Police learned Thomas had two cellphones. An officer analyzed the calls, texts, and transmission towers used by the phones and learned that on May 30, between 1:58 a.m. and 3:49 a.m. there was no activity on Thomas's AT&T phone. On his other, I Wireless, phone there was no activity between 2:11 a.m. to

2:55 a.m. and again between 3:44 a.m. and 4:47 a.m. According to cell-tower records, from 12:17 a.m. to 4:35 a.m. on May 30, Thomas's AT&T phone was located in various areas ranging from those encompassing Mother Hubbard's Cupboard convenience store, to the Heatherton Apartments, and then within the area Brooks's body was found. At 4:40 a.m., Thomas's AT&T phone was in the area of Gervonte Williams's address, where it was active until 4:54 a.m. and then again beginning at 7:13 a.m.

Thomas was recorded making phone calls to his girlfriend from jail. In it, he denied killing anyone. He denied having been driving around in a van on the night of Brooks's death. At one point he said either "gasoline wasn't the plan" or "definitely wasn't the plan."

The jury found Thomas guilty as charged, and he now appeals. Thomas contends there is not sufficient evidence to convict him of either offense.

**II. Scope and Standard of Review**.

We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005).

> We uphold a verdict if substantial evidence supports it. "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." Substantial evidence must do more than raise suspicion or speculation. We consider all record evidence not just the evidence supporting guilt when we make sufficiency-of-the-evidence determinations. However, in making such determinations, we also view the "evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence."

*Id.* (citations omitted).

**III. Discussion.**

Thomas contends there is no evidence Thomas participated in Brooks's murder. He claims the convictions are based solely on speculation and the "State allegations of murder were based largely on the fact that the murder took place in his apartment."

It is true that a defendant's conviction may not stand on speculation alone. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016) ("If evidence only raises 'suspicion, speculation, or conjecture,' it is not substantial evidence." (citation omitted)). However, it is also true that direct evidence of guilt is not required. "The law does not distinguish between direct evidence and circumstantial evidence of a crime. A defendant may be convicted solely on circumstantial evidence if it is sufficiently compelling to convince a judge or jury of the defendant's guilt beyond a reasonable doubt." *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017) (citation omitted).

The jury was instructed that to find Thomas guilty of first-degree murder the State had to prove:

> (1) On or about the 30th day of May, 2017, the defendant shot and inflicted blunt force injuries to Brandon Brooks.
> (2) Brandon Brooks died as a result of being shot and inflicted with blunt force injuries.
> (3) The defendant acted with malice aforethought.
> (4) The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill Brandon Brooks.

Here, there is no doubt that Brooks died due to the combined effects of blunt force injuries and being shot in the arm at close range, which led to the shattering of the bone and heavy blood loss. As the jury was instructed, "If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting

in death, you may . . . infer that the weapon was used with malice premeditation, and specific intent to kill." The only real question presented to the jury was whether Thomas was the person responsible.

While circumstantial, the evidence is sufficiently compelling to convince the jury of Thomas's guilt. The case does not stand only on Brooks's blood being found throughout Thomas's apartment. Thomas's statements to police that he did not leave his girlfriend's apartment May 29 to 30 are belied by video of him at the Mother Hubbard's Cupboard convenience store (where Brooks had been just minutes before and been picked up at Thomas's request) with Williams and Jackson. At 3:45 a.m., Thomas was seen at the Heatherton Apartments' storeroom, near Thomas's own apartment, where Thomas removes a gas can from the storeroom. And Thomas was seen driving away in the van Williams had been driving earlier at the convenience store. It is the same van in which a hammer, bat, gas can, and Brooks's blood were found near Williams's residence. Thomas's cellphone usage was traced from areas encompassing the convenience store, to the storeroom and his apartment, the area where Brooks's body was found, and then Williams's apartment. In addition, Thomas owned the truck found near Williams's residence—Brooks's blood was present in the bed of the truck, and a lighter and ammunition were found in the truck. A similar truck was seen on video driving away from the area of Brooks's body at 4:12 a.m. When found, the truck smelled strongly of cleaning agents, and a number of cleaning products were found in the truck. Both vehicles were found near Williams's residence—a place police had previously had contact with Thomas and where Thomas's cellphone was active at 4:54 a.m. and 7:15 a.m. Thomas's statements to the police on May 30

included information about Brooks's death that police had not shared with Thomas. There is an abundance of evidence from which the jury could find Thomas was responsible. *See State v. Tucker*, 810 N.W.2d 519, 520–21 (Iowa Ct. App. 2012) (concluding circumstantial evidence "provided ample evidence from which a jury could find that Tucker acted deliberately and with a fixed purpose or design to kill [the victim]"). We therefore affirm.

**AFFIRMED.**