# IN THE COURT OF APPEALS OF IOWA

No. 23-0390
Filed May 22, 2024

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**RAYMOND LEO SHOWERS,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Des Moines County, Michael J. Schilling, Judge.


　　　A defendant appeals his conviction for third-degree sexual abuse, challenging the sufficiency of the evidence supporting the conviction. **AFFIRMED.**


　　　Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

　　　Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.


　　　Considered by Bower, C.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

In this case, the State asks that "we overrule *State v. Smith*, 508 N.W.2d 101 (Iowa Ct. App. 1993), which may require the Court to sit *en banc*." We do not take that path today but emphasize *Smith* sits as an "outlier" case that does not impact our decision here. *See State v. Mathis,* 971 N.W.2d 514, 518 (Iowa 2022) ("[*Smith*] has been criticized in the commentary, and it has not been followed in any sexual abuse case in Iowa since."). In the present case, the State charged Raymond Showers via trial information with second-degree sexual abuse, a class "B" felony, in violation of Iowa Code sections 709.1 and 709.3(1)(a) (2021). In the trial information, the State accused Showers of sexually abusing the victim, L.P., on or about December 1, 2021. L.P. was sixteen years old in 2021. Prior to trial, L.P. gave a deposition.[1] After the deposition, the State moved to amend the trial information to accuse Showers of sexually abusing L.P. between November 26 and December 31, 2021. The district court granted the motion.

A jury heard the case in January 2023, and L.P. testified. On direct examination, she stated that around October or November of 2021 she came to stay with a friend in Burlington because she "was on drugs at the time and it was— I was having a rough time at my dad's house." L.P. estimated that she moved in with a different friend who ran a "drug house" about a month later. She reasoned that because she wasn't carrying a calendar, she wasn't sure of the exact month she moved. Sometime after moving in with that second friend, she met Showers. L.P. believed that this meeting happened after Thanksgiving. As for details

---

[1] The deposition is not part of our record on appeal.

remembered, L.P. described Showers's vehicle—a blue Dodge Ram—and could list the address of the house belonging to Showers's mother, Loretta Lovitt, where Showers was living. She also described in detail the layout of the house. Showers offered and the court admitted photographs of the house and a map of its first floor, which matched L.P.'s descriptions of the locations of the rooms in the house.

L.P. explained that she was smoking methamphetamine and marijuana and drinking hard alcohol from the time she arrived at Lovitt's house. On the second day at Lovitt's house, L.P. remembered drinking coffee and also eating ice cream that Showers gave her, which tasted funny and made her feel dizzy. After she passed out sometime in the afternoon on that second day there, she awoke to Showers in his bed with her; L.P. was wearing sweatpants and a t-shirt while Showers was in just his underwear. L.P. testified that Showers removed her pants and underwear and began touching her in her vaginal area. L.P. tried to get Showers off of her and told him to stop; Showers said nothing. He placed "his fingers inside of" her and then inserted his penis into her vagina. After a couple minutes, Showers ejaculated. Showers then told L.P. to get in the shower and got in the shower with her. L.P. stated that she "felt nasty. I felt like it was my fault." After the shower, she "laid in bed and cried while [Showers] did his own thing."

L.P. believed that she was at Lovitt's house for "the whole month of December" but was not certain. Showers sexually assaulted her "[a] couple times a day" during that time. When asked why she did not leave the house, L.P. said that she "wasn't allowed to" because Showers "wouldn't let me." She said that "[h]e would threaten me. He would lock me in the bedroom." More specifically, L.P. described that Showers "would threaten me with the gun" from "in his closet."

She added that Showers "told [her] if [she] tried leaving he'd shoot [her] brains out." L.P. could always see the gun leaning against the side of the closet in the bedroom. L.P. added that she was too scared to leave. As L.P. described it, Showers controlled when she ate, showered, used the bathroom, and washed her clothes. She testified that he was always in the room with her unless she was locked in the bedroom alone; Showers locked the door to the bedroom from the outside, and L.P. tried but could not open the windows. She never saw anyone else at the house besides Showers, and Showers took and hid her cell phone before eventually smashing it.

After a while, Showers allowed L.P. to leave the house to earn money cleaning their acquaintances' houses. Showers would drop her off and pick her up from the cleaning jobs. She tried to tell the acquaintances what was happening to her, "but they were all drugged out." After L.P. "worked up enough courage to run," she went to a homeless shelter; the shelter staff called her parents. Burlington Police Officers dropped her off at her mom's house. L.P. did not tell the shelter staff, the officers, or her parents what happened because she "was scared to." Finally, in August, L.P. went to a Child Protection Center (CPC) and told forensic interviewer Rebecca Valladares about the previous weeks because she "knew it was somebody safe and somebody I could trust. And she believed me."

On cross-examination, L.P. was questioned about several instances involving conflicting statements, including information that came from her interview with Burlington Police Detective Kegan Jacobson held after the CPC interview. She admitted that she did not mention the funny-tasting coffee or ice cream at the deposition or to Detective Jacobson. Showers paraphrased the deposition

repeatedly and then asked L.P. if she remembered the paraphrased statements. First, he asked,

> Q. Do you remember telling me two weeks ago in your deposition that you lived at [Showers's] for a week before the first sexual incident happened? A. I don't remember saying that.
> Q. I asked you how long were you there at his house before the first sexual incident, your answer: "Probably a week." Does that help you remember? A. Meaning I wasn't sure.

Then, Showers asked about L.P.'s attempts to escape saying, "in my deposition when I asked you about that you said you made no attempts to escape. Do you remember saying that?" L.P. said, "No." Showers asked if L.P. denied "that that's what you said?" And L.P. answered, "No." Showers also asked about L.P.'s earlier statements about going to a hotel, instead of directly going to Showers's place, and conflicts in her statements about whether she ever stayed in Showers's guest room. L.P. waffled in her responses to both inquiries. Lastly, Showers and L.P. also went back and forth about whether the sexual assaults happened two or three times a day. Showers stated: "But in your deposition you said three times a day." L.P. responded, "Yes, meaning a couple." On redirect examination, L.P. explained that when she was drinking and doing drugs she would lose pieces of time. When asked if she "recall[ed] being sexually assaulted by . . . Showers", L.P. answered, "Yes."

Detective Jacobson testified after L.P. In his interview with Showers after Showers was told he was being investigated for a sexual assault, Jacobson asked about Showers knowing the owner of the "drug house," Showers "clammed up." As for his interview with L.P., Detective Jacobson stated that L.P. did not tell him about spiked coffee or ice cream but did claim that Showers sexually assaulted

her three times a day for a month. When Valladares testified, she opined that if a child is intoxicated during a traumatic event "they're not going to remember that situation like they would if they were not under the influence."

Both Lovitt and Showers's friend, Wendy Rice Fenton, also testified at trial. Lovitt testified that the doors in her house unlock from the inside even if locked from the outside. Pointing to photographs of the locks and windows, she added that she had unlocked the windows and removed the screens recently and found both easy to do. The court admitted Lovitt's bank statements, which showed that she made purchases in the Burlington area from November 26 through December 17, 2021; Detective Jacobson confirmed that, based on cell phone location data, Lovitt was traveling west and then south from Burlington to Arizona beginning on December 17 and that she did not return until March 2022. Lovitt could not directly remember meeting Rice Fenton before leaving the state on December 17 and did not confirm being around her during any days in December 2021. Lovitt also stated that her grandson, Showers's son, stayed at the house for three or four days between Christmas and New Year's Day. Lovitt insisted that she did not know L.P. and had never seen her in her house. Rice Fenton testified that she met Showers in November 2021 and that they "were friends and friends with benefits." After meeting Showers, Rice Fenton would stay at Lovitt's house "[c]lose to daily." She stated that she did not believe it was possible that a teenage girl was at the house at the times that she was. Showers also sometimes stayed at Rice Fenton's house. Lastly, she testified that she met Lovitt sometime in November but was unsure if she met her again before Lovitt returned from Arizona.

The jury found Showers guilty of the lesser-included offense of third-degree sexual abuse in violation of Iowa Code section 709.4(1)(a), a class "C" felony. The court sentenced Showers to a term of imprisonment not to exceed ten years. Showers appeals.

**I. Standard of Review.**

We review claims of insufficient evidence for correction of errors at law. *State v. Cook*, 996 N.W.2d 703, 708 (Iowa 2023). "We will uphold a jury's verdict if it is supported by substantial evidence." *Id.* "Evidence is substantial if it is 'sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *Mathis*, 971 N.W.2d at 516–17). We "view the 'evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (quoting *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005)). Evidence that does no more than "raise[] suspicion, speculation, or conjecture is insufficient." *State v. West Vangen*, 975 N.W.2d 344, 349 (Iowa 2022) (citation omitted).

**II. Analysis.**

Showers contends that there is not sufficient evidence to support his conviction, specifically because L.P.'s stories changed between her deposition, interviews, and her trial testimony and because he presented testimony from two witnesses that contradicted L.P.'s claims. He claims that "L.P.'s uncorroborated and absurd testimony was not credible enough to provide sufficient evidence to support a conviction."

"Jury instructions, when not objected to, become the law of the case for purposes of appellate review for sufficiency-of-evidence claims."  *State v. Schiebout*, 944 N.W.2d 666, 671 (Iowa 2020).  The jury instructions for third-degree sexual abuse required the State to prove: "1. Between the dates of November 26, 2021, and December 31, 2021, [Showers] performed a sex act with L.P.  and 2. [Showers] performed the sex act by force or against the will of L.P."  The jury instructions further defined "sex act" to mean any sexual contact

> 1. By penetration of the penis into the vagina or anus.
> 2. Between the mouth of one person and the genitals of another.
> 3. Between the genitals of one person and the genitals or anus of another.
> 4. Between the finger or hand of one person and the genitals or anus of another person.
> 5. By a person's use of an artificial sex organ or a substitute for a sexual organ in contact with the genitals or anus of another.

The instructions also stated that the jury "may consider the type of contact and the circumstances surrounding it in deciding whether the contact was sexual in nature."  Lastly, regarding "by force or against the will," the jury instructions laid out that "[t]he force used by [Showers] does not have to be physical.  It may consist of threats of violence against [L.P.] . . . which overcame [her] will by fear."  The instruction gave the same clarification that the jury could consider "all of the circumstances surrounding [Showers's] act in deciding whether the act was done by force or against the will of L.P."

In reviewing jury verdicts, generally, "[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury."  *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005)

(citation omitted). "[W]e defer to the fact finder's determinations concerning witness credibility." *State v. Wells*, 629 N.W.2d 346, 356 (Iowa 2001). This is so because "[i]nherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006) (citation omitted); *accord State v. Shorter*, 945 N.W.2d 1, 10 (Iowa 2020) ("[T]he jury can believe some of a witness's story while rejecting other parts.") Additionally, "[a] sexual abuse victim's testimony alone may be sufficient evidence for conviction." *State v. Donahue*, 957 N.W.2d 1, 10–11 (Iowa 2021); *accord* Iowa R. Crim. P. 2.21(3) ("Corroboration of the testimony of victims shall not be required.").

However, Showers leans on the exception to this general rule for "a witness who so contradicts [herself] as to render finding of facts [premised on her testimony] a mere guess." *State v. Mitchell*, 568 N.W.2d 493, 503 (Iowa 1997) (citation omitted).[2] He argues that this court should rely on *Smith* to disregard L.P.'s contradictory testimony. 508 N.W.2d at 103. In *Smith,* our court found the evidence presented was insufficient as a matter of law because the testimony of two child witnesses was "inconsistent, self-contradictory, lacking in experiential detail, and, at times, border[ed] on the absurd."[3] *Id.* More specifically, as to one

---

[2] This doctrine was developed first in *Graham v. Chicago & Nw. Ry. Co.*, 119 N.W. 708, 709 (Iowa 1909) and *State ex rel. Mochnick v. Andrioli*, 249 N.W. 379, 380 (Iowa 1933). Yet, in *Mitchell* and *Andrioli,* corroboration of the victim's testimony allowed resolution of "inconsistencies" within the witnesses's testimony. *See Mitchell*,568 N.W.2d at 504; *Andrioli*, 249 N.W. at 380. Thus, this doctrine should not be read to be a backdoor requirement for corroboration of the victim's account of abuse, whether conflicting at times or not. *See State v. Kraai*, 969 N.W.2d 487, 490–91 (Iowa 2022) (discussing the history leading to the removal of the need for corroboration evidence in sexual abuse cases).

[3] One judge of the three-judge panel dissented.

of the child witnesses, the court found the "testimony as a whole [was] self-contradictory, lack[ed] experiential detail, and describe[d] scenes . . . that border on the surreal," so it lacked "the probative value needed to support a guilty verdict." *Id.* at 104. The court's decision hinged largely on the fact that "[n]o one, other than the girls themselves, ever saw or heard [the defendant] do or say anything that would raise any suspicion he was abusing them—even those who were in the room during the alleged episodes of abuse." *Id.* at 105.

The State urges us to overrule *Smith*, pointing to "questions of whether *Smith* even remains a viable precedent." *State v. Ross*, No. 20-0914, 2022 WL 3440701, at *2 (Iowa Ct. App. Aug. 17, 2022) (considering *Mathis*, 971 N.W.2d at 518). Indeed, our court has stated that "[t]he use of the doctrine relied upon in *Smith* to vacate a conviction is 'exceedingly rare.'" *State v. Atkins*, No. 20-0488, 2021 WL 3895198, at *3 (Iowa Ct. App. Sept. 1, 2021) (quoting *State v. Hobbs*, No. 12-0730, 2013 WL 988860, at *3 (Iowa Ct. App. Mar. 13, 2013)). Iowa courts have repeatedly deviated from *Smith*, distinguishing on different facts between the cases. *See, e.g., State v. Trane*, 984 N.W.2d 429, 437 (Iowa 2023) (finding "no fatal deficiencies in [the witness's] testimony that would have required the district court to find her unbelievable"); *State v. Veverka*, No. 22-0255, 2023 WL 5949004, at *5 (Iowa Ct. App. Sept. 13, 2023) ("Even assuming *Smith* remains good law, [the child witness's] statements were not so inconsistent or otherwise deficient that the district court was required to find her unbelievable.").

Taking a cue from the discussions about *Smith* since its inception,[4] we point out that not only did *Smith* draw on archaic concepts about sexual abuse to support its decision, but it also glossed over the gatekeeping concepts that must frame our analysis. "*Smith* is at best wrongheaded and at worst offensive and dangerous." Buller, 102 Iowa L. Rev. Online, at 186; *accord id.* at 194 (opining that *Smith* "reinforce[s] outdated myths that perpetuate rape culture and harm the victims of sexual assault"). We agree with our supreme court that "[t]he primary flaw in *Smith* is that it is inconsistent with the standard of appellate review of jury verdicts, which requires that the evidence be viewed in the light most favorable to the verdict and which requires deference to the jury's resolution of disputed factual issues." *Mathis*, 971 N.W.2d at 518.

Along with our supreme court's directive over the ill-advised use of the *Smith* case, each decision departing from or declining to follow *Smith* is an implicit

---

[4] If we are keeping score, six active judges writing for panels of our court have declined to follow *Smith*. *See State v. Crews*, No. 22-1031, 2023 WL 2908621, at *3 (Iowa Ct. App. Apr. 12, 2023); *State v. Duran-Sierra*, No. 21-1312, 2023 WL 2148743, at *2 (Iowa Ct. App. Feb. 22, 2023); *Ross*, 2022 WL 3440701, at *2; *Atkins*, 2021 WL 3895198, at *3; *State v. Mayes*, No. 19-0252, 2020 WL 2060306, at *6 (Iowa Ct. App. Apr. 29, 2020); *State v. Lusk*, No. 15-1294, 2016 WL 4384672, at *2 (Iowa Ct. App. Aug. 17, 2016). Four current senior judges have done the same. *See Veverka*, 2023 WL 5949004, at *5; *State v. Garduno-Rodriguez*, No. 17-1165, 2018 WL 3057543, at *2 (Iowa Ct. App. June 20, 2018); *State v. Schondelmeyer*, No. 14-0621, 2015 WL 1817030, at *3–4 (Iowa Ct. App. Apr. 22, 2015); *State v. Umana*, No. 11-0667, 2012 WL 4513859, at *8–9 (Iowa Ct. App. Oct. 3, 2012). Another active judge—before his appointment to judicial office—openly requested that we bury *Smith* in a law review article. *See generally* Tyler J. Buller, State v. Smith *Perpetuates Rape Myths and Should Be Formally Disavowed*, 102 Iowa L. Rev. Online 185 (2017) [hereinafter Buller]. And our supreme court has taken up *Smith* in two recent cases and expressed skepticism about its applicability. *See Trane*, 984 N.W.2d at 437; *Mathis*, 971 N.W.2d at 518. In a total of seventy-seven cases over the past thirty years, our courts have found *Smith* did not control.

recognition of the incorrect reasoning employed in that decision. As our decisions over the last thirty years suggest, we have not returned to the flawed analysis found in *Smith*. Our courts have done so when the witness was intoxicated at the time of the alleged abuse or a child. *See, e.g.*, *Duran-Sierra*, 2023 WL 2148743, at *2 (finding substantial evidence to support the conviction and declining to review the witness's credibility even though she was intoxicated the night of the incident); *State v. Fangman*, No. 22-0256, 2023 WL 152571, at *2 (Iowa Ct. App. Jan. 11, 2023) (finding substantial evidence supported the conviction even when the child witness was intoxicated to the point of vomiting and told different stories to various people). We did so because "child victims often have trouble recalling details of attacks and fail to report sex abuse crimes in a timely fashion" and "[i]nconsistencies and lack of detail are common in sexual abuse cases and do not compel a jury to conclude that the victim is not credible or that there is insufficient evidence to support a guilty verdict." *Donahue*, 957 N.W.2d at 10, 11.

Iowa courts have additionally done so when the victim could not pin down the dates, times, or location of the sexual abuse. *Id.* at 10; *Atkins*, 2021 WL 3895198, at *3 ("Inconsistencies in [the victim's] testimony regarding the particular time and location of specific instances of abuse over the relevant time period do not preclude a conviction."); *Crews*, 2023 WL 2908621, at *3 ("[T]he children could not pin down exact dates or times of day when the incidents occurred, but such specificity is not required."). We consider that our society today understands better the emotional and psychological hurdles that impact the reporting and memory of sexual assaults and that education is imparted to juries in these cases. *See* Buller, 102 Iowa L. Rev. Online, at 200. So once evidence is

laid out, on our review we must look at it in the light most favorable to the verdict, requiring deference to the jury's resolution of disputed factual issues and not our vantage point from a cold record. *Cook*, 996 N.W.2d at 708.

So, under the appropriate review, with the evidence viewed in the light most favorable to the verdict, Showers's attack on the sufficiency of the evidence here fails. Although Showers argues that Lovitt, Rice Fenton, and Showers's son were all at the house around the same time as L.P., Lovitt's and Rice Fenton's stories were also inconsistent; Lovitt believed she met Rice Fenton only once in November and made no mention of seeing her in December, but Rice Fenton testified that she met Lovitt every time she came over to the house after meeting Showers in November. Similarly, Lovitt believed that no one else was in the house besides Showers until Lovitt left for Arizona on December 17; Rice Fenton insisted that she was at the house nearly every day. The jury, as fact finders, could have disregarded their imprecise timelines and found that L.P. was the only other person in the house with Showers at the time of the alleged sexual abuse.

Thus, we find that a reasonable jury could have found beyond a reasonable doubt that Showers performed a sex act with L.P. against her force or will, even given the inconsistencies in her story. Although lacking specific details about dates, L.P. testified that at some point at the end of 2021, Showers inserted his fingers into her vagina and then inserted his penis into her vagina without her consent. As the sexual assaults continued and when she resisted, Showers threatened her with a firearm and told her if she tried to leave he would "shoot her brains out." And while Lovitt and Rice Fenton raise questions about L.P.'s story, they mainly question the *timeline* of these events; principally, they insist that the

events could not have happened while they were also in Lovitt's house. The jury was at liberty to reconcile their testimony with L.P.'s, even to reject parts of L.P.'s testimony, and there was substantial evidence for them to reach the verdict they did without a pinpointed timeline. For these reasons, substantial evidence supports Showers's conviction for third-degree sexual abuse, and we affirm.

**AFFIRMED.**